MARY ANN HATT *v.* BURLINGTON
COAT FACTORY ET AL.
(SC 16737)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

Argued September 24, 2002—officially released April 22, 2003

*Joseph J. Passaretti, Jr.*, with whom was *Karen A. Wright*, for the appellants (named defendant et al.).

*Lori D. McHugh*, for the appellee (defendant Fireman's Fund Insurance Company).

*Opinion*

NORCOTT, J. This appeal presents the issues of whether the workers' compensation review board (board) improperly: (1) concluded that General Statutes § 31-349[1] abrogated common-law apportionment in

[1] General Statutes § 31-349 provides: "(a) The fact that an employee has suffered a previous disability, shall not preclude him from compensation for a second injury, nor preclude compensation for death resulting from the second injury. If an employee having a previous disability incurs a second disability from a second injury resulting in a permanent disability caused by both the previous disability and the second injury which is materially and substantially greater than the disability that would have resulted from the second injury alone, he shall receive compensation for (1) the entire amount of disability, including total disability, less any compensation payable or paid with respect to the previous disability, and (2) necessary medical

workers' compensation cases and that § 31-349 (d),

care, as provided in this chapter, notwithstanding the fact that part of the disability was due to a previous disability. For purposes of this subsection, 'compensation payable or paid with respect to the previous disability' includes compensation payable or paid pursuant to the provisions of this chapter, as well as any other compensation payable or paid in connection with the previous disability, regardless of the source of such compensation.

"(b) As a condition precedent to the liability of the Second Injury Fund, the employer or its insurer shall: (1) Notify the custodian of the fund by certified mail no later than three calendar years after the date of injury or no later than ninety days after completion of payments for the first one hundred and four weeks of disability, whichever is earlier, of its intent to transfer liability for the claim to the Second Injury Fund; (2) include with the notification (A) copies of all medical reports, (B) an accounting of all benefits paid, (C) copies of all findings, awards and approved voluntary agreements, (D) the employer's or insurer's estimate of the reserve amount to ultimate value for the claim, (E) a two-thousand-dollar notification fee payable to the custodian to cover the fund's costs in evaluating the claim proposed to be transferred and (F) such other material as the custodian may require. The employer by whom the employee is employed at the time of the second injury, or its insurer, shall in the first instance pay all awards of compensation and all medical expenses provided by this chapter for the first one hundred four weeks of disability. Failure on the part of the employer or an insurer to comply does not relieve the employer or insurer of its obligation to continue furnishing compensation under the provisions of this chapter. The custodian of the fund shall, by certified mail, notify a self-insured employer or an insurer, as applicable, of the rejection of the claim within ninety days after receiving the completed notification. Any claim which is not rejected pursuant to this section shall be deemed accepted, unless the custodian notifies the self-insured employer or the insurer within the ninety-day period that up to an additional ninety days is necessary to determine if the claim for transfer will be accepted. If the claim is accepted for transfer, the custodian shall file with the workers' compensation commissioner for the district in which the claim was filed, a form indicating that the claim has been transferred to the Second Injury Fund and the date that such claim was transferred and shall refund fifteen hundred dollars of the notification fee to the self-insured employer or the insurer, as applicable. A copy of the form shall be mailed to the self-insured employer or the insurer and to the claimant. No further action by the commissioner shall be required to transfer said claim. If the custodian rejects the claim of the employer or its insurer, the question shall be submitted by certified mail within thirty days of the receipt of the notice of rejection by the employer or its insurer to the commissioner having jurisdiction, and the employer or insurer shall continue furnishing compensation until the outcome is finally decided. Claims not submitted to the commissioner within said time period shall be deemed withdrawn with prejudice. If the employer or insurer pre-

which closed the second injury fund to new claims, renders the insurer at the time of the claimant's second injury solely liable for those disability claims; (2) concluded that General Statutes (Rev. to 1999) § 31-299b[2] permits apportionment only in cases of repetitive

vails, or if the custodian accepts the claim all payments made beyond the one-hundred-four-week period shall be reimbursed to the employer or insurer by the Second Injury Fund.

"(c) If the second injury of an employee results in the death of the employee, and it is determined that the death would not have occurred except for a preexisting permanent physical impairment, the employer or its insurer shall, in the first instance, pay the funeral expense described in this chapter, and shall pay death benefits as may be due for the first one hundred four weeks. The employer or its insurer may thereafter transfer liability for the death benefits to the Second Injury Fund in accordance with the procedures set forth in subsection (b) of this section.

"(d) Notwithstanding the provisions of this section, no injury which occurs on or after July 1, 1995, shall serve as a basis for transfer of a claim to the Second Injury Fund under this section. All such claims shall remain the responsibility of the employer or its insurer under the provisions of this section.

"(e) All claims for transfer of injuries for which the fund has been notified prior to July 1, 1995, shall be deemed withdrawn with prejudice, unless the employer or its insurer notifies the custodian of the fund by certified mail prior to October 1, 1995, of its intention to pursue transfer pursuant to the provisions of this section. No notification fee shall be required for notices submitted pursuant to this subsection. This subsection shall not apply to notices submitted prior to July 1, 1995, in response to the custodian's request, issued on March 15, 1995, for voluntary resubmission of notices.

"(f) No claim, where the custodian of the Second Injury Fund was served with a valid notice of intent to transfer under this section, shall be eligible for transfer to the Second Injury Fund unless all requirements for transfer, including payment of the one hundred and four weeks of benefits by the employer or its insurer, have been completed prior to July 1, 1999. All claims, pursuant to this section, not eligible for transfer to the fund on or before July 1, 1999, will remain the responsibility of the employer or its insurer."

[2] General Statutes (Rev. to 1999) § 31-299b provides: "If an employee suffers an injury or disease for which compensation is found by the commissioner to be payable according to the provisions of this chapter, the employer who last employed the claimant prior to the filing of the claim, or the employer's insurer, shall be initially liable for the payment of such compensation. The commissioner shall, within a reasonable period of time after issuing an award, on the basis of the record of the hearing, determine whether prior employers, or their insurers, are liable for a portion of such compensation and the extent of their liability. If prior employers are found to be so liable,

trauma or occupational disease and, therefore, does not provide a basis for apportionment of liability among insurers when the claimant has suffered two separate and distinct injuries; and (3) denied the motion of the defendant Atlantic Mutual Insurance Company (Atlantic Mutual) to dismiss the appeal of the defendant Fireman's Fund Insurance Company (Fireman's Fund) from the decision of the workers' compensation commissioner (commissioner). The board concluded that Atlantic Mutual was solely responsible for the medical and disability expenses of the plaintiff, Mary Ann Hatt,[3] and could not seek apportionment of any part of its liability for those expenses from Fireman's Fund. Atlantic Mutual appeals[4] from, and we affirm, the decision of the board.

The record reveals that the facts and procedural history relevant to the disposition of this appeal are not in dispute. The plaintiff has worked full-time for the named defendant, Burlington Coat Factory, since September, 1982. She initially was hired as a sales associate and then was promoted to department manager in 1986.

the commissioner shall order such employers or their insurers to reimburse the initially liable employer or insurer according to the proportion of their liability. Reimbursement shall be made within ten days of the commissioner's order with interest, from the date of the initial payment, at twelve per cent per annum. If no appeal from the commissioner's order is taken by any employer or insurer within ten days, the order shall be final and may be enforced in the same manner as a judgment of the Superior Court."

General Statutes (Rev. to 1999) § 31-299b has since been amended by Public Acts 2001, No. 01-22, § 2, which extends the appeals period to twenty days following the entry of the commissioner's order. That change is not relevant to this appeal. Hereafter, unless otherwise indicated, references to § 31-299b are to the 1999 revision of that statute.

[3] The plaintiff did not file a brief in this appeal, which centers on a dispute between Fireman's Fund and Atlantic Mutual, the workers' compensation insurance carriers for the named defendant, Burlington Coat Factory, at the time of the plaintiff's various injuries.

[4] Atlantic Mutual appealed from the board's decision to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

The plaintiff's work duties in both positions required her to be on her feet constantly for approximately eight hours per day. On February 19, 1988, she suffered an injury to her left ankle and foot when she stepped on the base of a clothing rack while moving it through the store. The plaintiff promptly reported her injury and was treated by William Jones, an orthopedist. She was disabled for ten to fourteen days following this injury, and she continued to suffer "knife-like" pain in her left foot after she returned to work. Despite her constant pain, the plaintiff's duties did not change when she returned to work and continued to require her to stand for long hours. She returned to Jones in June, 1989, because of her continuing pain. He diagnosed her with a severe muscle and ligament strain to her left foot, noting a deformity, but concluded that X rays showed no evidence of a fracture or of other bone or joint abnormalities. At that examination in June, 1989, Jones found that the plaintiff had suffered a permanent impairment as a result of the injury and rated her as having a 10 percent disability of the left foot. Jones then prescribed orthotic supports for the plaintiff's foot. Fireman's Fund, as the workers' compensation liability insurer for Burlington Coat Factory at that time, issued a voluntary agreement, which a commissioner approved on January 24, 1990, indemnifying the plaintiff for this disability, and paying her other disability and medical benefits.

The plaintiff continued to see Jones for treatment of her injury into the 1990s. She also continued to work for Burlington Coat Factory, remaining constantly on her feet for more than forty hours per week. During the early 1990s, her pain progressively worsened. The plaintiff's injury and its accompanying pain grew progressively worse to the point that, by 1994, the appearance of her left foot had changed dramatically.[5] She

---

[5] The plaintiff described her foot in 1994 as "flat as a pancake. . . . The heel was twisted and the whole foot was flat on the ground."

continued to see Jones for treatment; in October, 1995, after taking X rays, he prescribed new orthotics and increased her disability rating to 25 percent.

In August, 1997, Fireman's Fund filed notice with the commissioner that it intended to contest liability for the plaintiff's continued treatment on the ground that the treatment was unrelated to the original 1988 injury. At that point, the plaintiff was still seeking additional medical opinions. In October, 1997, the plaintiff returned to Jones, who stated that, despite her continued pain, he did not think surgery was warranted for her injured foot. In 1998, Fireman's Fund sent the plaintiff to Vincent Santoro, another orthopedist, for an independent medical evaluation. In a May, 1998 report, Santoro concluded that the plaintiff had developed arthritis in her left foot, along with a progressive deformity and flattening of the arch. Santoro found that the arthritis was a more recent development because, in his opinion, the 1995 X rays showed that the plaintiff did not suffer arthritis at that time. He diagnosed her condition in 1998 as posterior tendon dysfunction with a secondary flat foot deformity. Santoro concluded that the plaintiff's left foot condition was unrelated to aging and was caused by aggravation of her initial compensable injuries resulting from her work duties from 1988 to 1999. He also determined that this condition could have resulted from a single trauma, or through a progressive degenerative process. Santoro concluded that the plaintiff had a 25 percent permanent disability of her left foot, and that it required surgery. Subsequently, in 1998, the plaintiff adopted Santoro as her treating physician. In March, 2000, Santoro performed corrective surgery on the plaintiff's left foot.

When Santoro examined the plaintiff in May, 1998, Burlington Coat Factory was no longer insured for workers' compensation by Fireman's Fund, and was insured by Atlantic Mutual. In August, 1998, the plaintiff

filed, with the commissioner, a notice of claim for compensation "for May 19, 1998 left and right foot injuries sustained after February 19, 1988, caused by continued exposure to her occupation at [Burlington Coat Factory]."[6] In September, 1998, Atlantic Mutual filed notice with the commissioner of its intention to contest liability for these injuries. In September, 1999, Stephen Selden, an orthopedist, examined the plaintiff at the request of Atlantic Mutual. Selden agreed with Santoro's diagnosis of a left posterior tendon dysfunction and his conclusion that surgery was a reasonable treatment. Selden disagreed, however, with Santoro's conclusion as to the etiology of the plaintiff's condition. Selden concluded that her condition in 1999 was the result of a combination from her initial 1988 injury, aging and excess weight.

At a hearing on the matter, the commissioner accepted Santoro's conclusions rather than Selden's, concluding that Santoro was in a better position to assess the etiology of the plaintiff's condition. The commissioner determined that the plaintiff's condition on May 19, 1998, was "an injury which arose during and out of the course of her employment . . . ." The commissioner stated that this condition was a cumulative injury that was the result of work activities following the initial 1988 injury. The commissioner further concluded that the liability for the plaintiff's post-May 19, 1998 disability from work and all associated medical expenses should be shared between the two insurers, Fireman's Fund and Atlantic Mutual, allocating 75 percent of the liability to Fireman's Fund and the remaining 25 percent to Atlantic Mutual. Pursuant to § 31-299b,

---

[6] No physician had ever diagnosed the plaintiff as having problems with her right foot. The plaintiff, however, testified before the commissioner that, by 1999, she had developed pain in her right foot that tended to intensify toward the end of her working day as a result of favoring her right foot over her more painful left foot.

the commissioner ordered Atlantic Mutual, as primary payor, to pay the plaintiff's total compensation and the associated medical expenses, and then ordered Fireman's Fund to reimburse Atlantic Mutual for 75 percent of those expenses.

Fireman's Fund then petitioned the board for review of the commissioner's decision. Fireman's Fund claimed that the commissioner improperly had apportioned to it 75 percent of the liability for the plaintiff's medical and disability benefits. Fireman's Fund contended that the entire liability should have been assigned to Atlantic Mutual because it was the employer's insurance carrier at the time of the second injury. Atlantic Mutual moved to dismiss Fireman's Fund's appeal to the board as untimely filed.

The board denied Atlantic Mutual's motion to dismiss because it concluded that Fireman's Fund lacked proper notice of the commissioner's decision, and reversed the commissioner's decision, holding that Atlantic Mutual, as Burlington Coat Factory's workers' compensation carrier at the time of the plaintiff's injury, solely was liable for the plaintiff's medical and disability expenses as a result of the second injury. The board determined that the plaintiff had in fact suffered two separate and distinct injuries to her left foot: (1) the single accident in 1988; and (2) a second injury resulting from multiple years of repetitive trauma. The board concluded that the apportionment scheme under § 31-299b was inapplicable because that statute addresses single injuries such as occupational diseases or repetitive traumas, namely, conditions resulting from a "period of prolonged exposure spanning a time continuum involving multiple employers or insurers." In the board's view, § 31-299b was not intended to "apportion liability among two or more entirely separate and identifiable injuries." The board then relied on our decision in *Fimiani* v. *Star Gallo Distributors, Inc.*, 248 Conn.

635, 729 A.2d 212 (1999), and concluded that, despite the closing of the second injury fund to new claims and our decision in *Mund* v. *Farmers' Cooperative, Inc.*, 139 Conn. 338, 94 A.2d 19 (1952), § 31-349 required that the employer and its carrier at the time of the second injury remain solely liable for all expenses stemming from that injury, "despite the role the . . . first injury played in causing [the] current condition." This appeal followed.

Atlantic Mutual claims that the board improperly denied its motion to dismiss the appeal of Fireman's Fund as untimely after concluding that Fireman's Fund lacked proper notice under General Statutes § 31-321[7] sufficient to trigger the ten day appeal period provided under General Statutes (Rev. to 1999) § 31-301 (a).[8] Atlantic Mutual also makes two apportionment claims that are conceptually related, despite having bases on distinct statutory grounds. In addressing these claims, we first review the history of the law governing the

---

[7] General Statutes § 31-321 provides in relevant part: "Unless otherwise specifically provided, or unless the circumstances of the case or the rules of the commission direct otherwise, any notice required under this chapter to be served upon an employer, employee or commissioner shall be by written or printed notice, service personally or by registered or certified mail addressed to the person upon whom it is to be served at his last-known residence or place of business. . . ."

[8] General Statutes (Rev. to 1999) § 31-301 (a) provides: "At any time within *ten* days after entry of an award by the commissioner, after a decision of the commissioner upon a motion or after an order by the commissioner according to the provisions of section 31-299b, either party may appeal therefrom to the Compensation Review Board by filing in the office of the commissioner from which the award or the decision on a motion originated an appeal petition and five copies thereof. The commissioner within three days thereafter shall mail the petition and three copies thereof to the chief of the Compensation Review Board and a copy thereof to the adverse party or parties." (Emphasis added.)

General Statutes (Rev. to 1999) § 31-301 (a) has since been amended by Public Acts 2001, No. 01-22, § 1, which extends the appeal period to twenty days following the entry of the award. That change is not relevant to this appeal. Hereafter, unless otherwise indicated, references to § 31-301 are to the 1999 revision of that statute.

availability of apportionment in both the second injury and occupational disease or repetitive trauma settings. See part III A of this opinion. With this valuable historical perspective, we then address Atlantic Mutual's contentions that the board improperly: (1) concluded that § 31-349 abrogated common-law apportionment and that § 31-349 (d) renders the insurer at the time of the employee's second injury solely liable for disability claims that previously would have been transferred to the second injury fund, even when the second injury was aggravated by the prior compensable injury; and (2) concluded that the apportionment scheme of § 31-299b applies only to cases of repetitive trauma or occupational disease, and not to situations when the claimant has suffered two entirely separate and distinct injuries. We disagree with all of Atlantic Mutual's claims, and we affirm the decision of the board.

I

## STANDARD OF REVIEW

Atlantic Mutual's claims involve the board's construction of various workers' compensation statutes. These claims, therefore, are all governed by the same standard of review. "Statutory construction is a question of law and therefore our review is plenary." *Davis* v. *Norwich*, 232 Conn. 311, 317, 654 A.2d 1221 (1995). "It is well established that [a]lthough not dispositive, we accord great weight to the construction given to the workers' compensation statutes by the commissioner and [the compensation] review board. . . . However, [w]e have determined . . . that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . ." (Citation omitted; internal quotation marks omitted.) *Donahue* v. *Southington*, 259

Conn. 783, 787, 792 A.2d 76 (2002); see also *Davis* v. *Norwich*, supra, 317. We have not previously construed the statutes at issue in this context. Our review in this case is, therefore, plenary.

In construing the workers' compensation statutes at issue, we follow the method of statutory interpretation recently articulated in *State* v. *Courchesne*, 262 Conn. 537, 816 A.2d 562 (2003). "The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Thus, this process requires us to consider all relevant sources of the meaning of the language at issue, without having to cross any threshold or thresholds of ambiguity. Thus, we do not follow the plain meaning rule.

"In performing this task, we begin with a searching examination of the language of the statute, because that is the most important factor to be considered. In doing so, we attempt to determine its range of plausible meanings and, if possible, narrow that range to those that appear most plausible. We do not, however, end with the language. We recognize, further, that the purpose or purposes of the legislation, and the context of the language, broadly understood, are directly relevant to the meaning of the language of the statute.

"This does not mean, however, that we will not, in a given case, follow what may be regarded as the plain

meaning of the language, namely, the meaning that, when the language is considered without reference to any extratextual sources of its meaning, appears to be *the* meaning and that appears to preclude any other likely meaning. In such a case, the more strongly the bare text supports such a meaning, the more persuasive the extratextual sources of meaning will have to be in order to yield a different meaning." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 577–78.

## II

### TIMELINESS OF FIREMAN'S FUND'S APPEAL TO THE BOARD

We first consider Atlantic Mutual's claim that the board improperly rejected its motion to dismiss Fireman's Fund's appeal for lack of timeliness because Fireman's Fund did not file its first petition for review until after the expiration of the ten day appeal period set forth under § 31-301 (a). Atlantic Mutual claims that the board improperly concluded that receipt by counsel for Fireman's Fund of a facsimile (fax) of the commissioner's decision one day before the expiration of the ten day appeal period was not proper notice of the decision under § 31-321 and, therefore, did not preclude Fireman's Fund from filing its appeal after the expiration of the prescribed time limit. We agree with the board's ruling and conclude that the fax did not constitute proper notice of the commissioner's decision under § 31-321.

The following additional facts are necessary for the resolution of this claim. The commissioner issued its decision on December 4, 2000. Firemen's Fund filed two petitions for review of the commissioner's decision with the board; the first on December 22, 2000, and the second on January 8, 2001. Firemen's Fund was and continues to be represented by the law firm Genovese,

Vehslage and LaRose[9] (Genovese). In February, 2000, Genovese moved its office from Farmington to Rocky Hill. The workers' compensation commission (commission) was duly notified and began routinely to send all hearing notices to Genovese's Rocky Hill address starting on March 1, 2000. When it notified Genovese of the commissioner's award in the present case, however, the commission mistakenly mailed the requisite notice to Genovese's previous address in Farmington. This error delayed Genovese's receipt of the certified letter; it did not receive the letter until January 3, 2001, while the other parties or their counsel all received their copies of the decision by December 6, 2000.

On December 13, 2000, Genovese personnel contacted the commission's district office to inquire whether a decision had been issued in the present case. At approximately 2:30 p.m. that day, nine days after the commissioner had issued its decision, a commission employee faxed a copy of the decision to Genovese. Genovese, thus, had actual notice of the decision one day before the appeal deadline. Genovese, however, did not file Fireman's Fund's first petition to the board for review until December 22, 2000. Atlantic Mutual moved to dismiss the appeal as untimely filed. The board denied the motion, citing our decision in *Kudlacz* v. *Lindberg Heat Treating Co.*, 250 Conn. 581, 738 A.2d 135 (1999), as "implicitly [contemplating] the delivery of notice via certified mail or other equivalent service under § 31-321 as a necessary component of meaningful notice for the purpose of determining appeal periods under § 31-301 (a)." The board, therefore, concluded that a party's responsive obligation, such as the need to file a timely appeal, could not be triggered in the absence of the commissioner's compliance with statutorily prescribed delivery methods.[10]

---

[9] The firm is now known as Genovese, Vehslage and Chapman.

[10] The board also stated that it would risk violating the parties' due process rights by "[holding] that an 'unofficial' and less formal type of notice, e.g.,

We have interpreted § 31-301 (a) to "include a requirement of notice to the party who might wish to appeal." *Trinkley* v. *Ella Grasso Regional Center*, 220 Conn. 739, 743, 601 A.2d 515 (1992). This construction is mandated by "[f]undamental rights to procedural due process . . . ." Id. In light of this compelling concern, we have articulated a framework to determine the commencement and tolling of the ten day appeal period under § 31-301 (a). That period begins to run on the date the commissioner *sends* notice of the decision to the party. *Kulig* v. *Crown Supermarket*, 250 Conn. 603, 604, 738 A.2d 613 (1999); see also *Conaci* v. *Hartford Hospital*, 36 Conn. App. 298, 303, 650 A.2d 613 (1994). If the party is represented by counsel, the ten day appeal period begins to run on the date that the commissioner sends notice to counsel. *Schreck* v. *Stamford*, 250 Conn. 592, 598, 737 A.2d 916 (1999). The ten day appeal period is tolled if "the aggrieved party establishes that, through no fault of [its] own, [it] did not receive notice of the commissioner's decision within ten days of the date that it was sent." *Kudlacz* v. *Lindberg Heat Treating Co.*, supra, 250 Conn. 590–91. A party that has established that it failed to receive notice of the commissioner's decision through no fault of its own "also must establish that the appeal was filed within ten days from the date that [it] actually received notice of the commissioner's decision." Id., 591 n.14.

The notice requirement of § 31-301 (a) has constitutional significance. See id., 588; *Trinkley* v. *Ella Grasso Regional Center*, supra, 220 Conn. 743. We have recognized the "obvious unfairness inherent in depriving an

transmission of a copy by [a] fax machine, was also sufficient to trigger a responsive obligation of the party receiving such 'lesser' notice." The board distinguished this situation from those times when a party, by faxing a document when personal delivery is impracticable, protects its *own* rights in response to an imminent filing deadline.

aggrieved party of the right to appeal the commissioner's decision solely because of a failure of notice beyond that party's control," and we have stated that "we will not lightly presume that the legislature intended such a result." *Kudlacz* v. *Lindberg Heat Treating Co.*, supra, 250 Conn. 588. *Kron* v. *Thelen*, 178 Conn. 189, 423 A.2d 857 (1979), is particularly instructive on this point. In *Kron*, we held that, when the Probate Court "by mistake or accident," failed to inform the plaintiff of its decision, "[t]he plaintiff's statutory right of appeal could not be defeated by the mistake of the Probate Court"; id., 196; and that "the statute fixing the time of appeal from a decree of the Probate Court is subject to the implied requirement that the court give notice of its decree before the thirty-day appeal period becomes operative." Id., 197. In rendering our decision in *Kron*, we recognized that "[f]undamental tenets of due process . . . require that all persons directly concerned in the result of an adjudication be given reasonable notice and the opportunity to present their claims or defenses." Id., 193.

We now turn to whether the fax from the commission constitutes proper notice of the commissioner's decision. Section 31-321 defines proper notice in workers' compensation proceedings as follows: "Unless otherwise specifically provided, or unless the circumstances of the case or the rules of the commission direct otherwise, any notice required under this chapter to be served upon an employer, employee or commissioner shall be by written or printed notice, *service personally or by registered or certified mail* addressed to the person upon whom it is to be served at his last-known residence or place of business. . . ." (Emphasis added.)

When a statute providing a party with a time-sensitive right to appeal contains service and notice prescriptions, we usually have required strict compliance with those procedural requirements. Cf. *Pacelli Bros. Trans-*

*portation, Inc.* v. *Pacelli,* 189 Conn. 401, 414, 456 A.2d 325 (1983) ("[w]here a party seeks the benefit of a statute requiring a prescribed form of notice to trigger its operation, we have insisted upon strict compliance with the statutory requirement"); *Tarnopol* v. *Connecticut Siting Council,* 212 Conn. 157, 163–64, 561 A.2d 931 (1989) ("[a] statutory right to appeal [from the determination of an administrative agency] may be taken advantage of only by strict compliance with the statutory provisions by which it is created" [internal quotation marks omitted]), superseded by statute on other grounds as stated in *Kindl* v. *Dept. of Social Services,* 69 Conn. App. 563, 573–74, 795 A.2d 622 (2002). Furthermore, although the legislative history is silent on this issue, the statute's language evinces the legislature's intent to restrict permissible methods of service under § 31-321 to personal delivery and registered or certified mail. When construed in light of the "tenet of statutory construction known as expressio unius est exclusio alterius, translated as the expression of one thing is the exclusion of another"; (internal quotation marks omitted) *Marrocco* v. *Giardino,* 255 Conn. 617, 637, 767 A.2d 720 (2001); the language of § 31-321 indicates that the legislature considered only personal delivery and registered or certified letters as acceptable methods of service. See also *Chairman, Criminal Justice Commission* v. *Freedom of Information Commission,* 217 Conn. 193, 200, 585 A.2d 96 (1991) ("[a] statute which provides that a thing shall be done in a certain way carries with it an implied prohibition against doing that thing in any other way" [internal quotation marks omitted]). Accordingly, our construction of § 31-321 and § 31-301 (a) leads us to conclude that strict compliance with the statutory methods of service under § 31-321 is necessary to constitute meaningful notice under § 31-301 (a).[11]

---

[11] A construction of these statutes to the contrary would have the undesirable effect of punishing diligence by counsel and pro se parties, thus discouraging these parties from inquiring about the status of their cases in the

Atlantic Mutual claims that compliance with § 31-321 is not necessary to satisfy the requirement of "meaningful notice." We disagree. In particular, Atlantic Mutual relies on *Vega* v. *Waltsco, Inc.*, 46 Conn. App. 298, 699 A.2d 247 (1997), and the board's decisions in *DeFelippi* v. *Wal-Mart Stores, Inc.*, 4349 CRB-5-01-1 (January 15, 2002), and *Fleming* v. *New Haven Register*, 1945 CRB-3-94-1 (September 6, 1995). Atlantic Mutual's reliance on these cases for this proposition is misplaced.

In *DeFelippi*, the board held that despite the dictates of § 31-321, a party could *protect* its right to appeal by faxing a copy of its petition to the board on the tenth day, while mailing the original and required copies for arrival on the following day. In *Fleming*, a claimant moved to preclude the employer's notice of intention to contest liability because the employer had sent the forms to the claimant and commission via regular mail,

future. It seems improbable that any competent attorney would ever actively inquire about the status of a pending case with the knowledge that a faxed, or, conceivably, oral, answer to that inquiry could be "notice" that might trigger an impending, fast-running appeal deadline. This is especially so when the alternative course of delaying that inquiry carries with it the increased likelihood of a "reward" in the form of an extension of time.

For example, in the present case, had Fireman's Fund waited two more days until December 15, 2000, to inquire about the status of the commissioner's decision, it would not have received any notice of the commissioner's decision within ten days of the decision being sent. In addition to sparing Fireman's Fund from the present controversy, this delay would have entitled it to ten additional days "from the date that [it] actually received notice of the commissioner's decision" to file an appeal. *Kudlacz* v. *Lindberg Heat Treating Co.*, supra, 250 Conn. 591 n.14. We are cognizant of the harsh effects of "litigation by ambush" tactics when undertaken by parties. See *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 547–48, 733 A.2d 197 (1999) (eve of trial expert disclosure); *Suffield Bank* v. *Berman*, 228 Conn. 766, 784–85, 639 A.2d 1033 (1994) (defendants' delay in alerting trial court about missing pages until after close of evidence was "trial by ambush" when they had opportunity to alert trial court of omission during "four days of hearings, over the course of several months"). Accordingly, we will not countenance the notion that litigants should be ambushed by a fast-running appeal deadline put in similar circumstances because of a tribunal's clerical error.

not certified or registered mail, as required under § 31-321. The board affirmed the commissioner's denial of the motion to preclude, concluding that "equitable considerations" play a part in the statute's application, that the applicable time limitations were complied with, and that the claimant was not prejudiced by the violation. *DeFelippi* and *Fleming* are, therefore, both distinguishable from the present case, which involves the commission's potentially harmful, and not a litigant's harmless, noncompliance with the rule dictating the form of notice.

Atlantic Mutual's reliance on *Vega* v. *Waltsco, Inc.*, supra, 46 Conn. App. 298, is similarly misplaced. In *Vega*, the Appellate Court distinguished workers' compensation cases from regular civil matters and held that to commence the running of the ten day appeal period, "meaningful notice" of a decision does not require the board to send notice concurrently to a represented party's attorney, so long as notice is sent to the party itself. Id., 303. In *Vega*, the Appellate Court defined "meaningful notice" as "the content of notice that is required to inform adequately the aggrieved party of the commissioner's findings. Meaningful notice gives the aggrieved party sufficient information to make a knowledgeable decision as to the next step in the litigation process." Id., 304. Indeed, *Vega*'s definition of "meaningful notice" demands the conclusion we reach in the present case. We note that, unlike most other methods of service, including fax, the methods prescribed by the legislature in § 31-321, e.g., certified mail, provide the recipient, the board, and the courts with specific knowledge and definite proof of when the commission actually *sent* notice of its decision. This is indisputably essential information that a party needs "to make a knowledgeable decision as to the next step in the litigation process"; id.; particularly in light of our previous holdings that the relevant ten day appeal

period begins when notice of the decision is *sent* by the commission. See *Kulig* v. *Crown Supermarket,* supra, 250 Conn. 604; *Schreck* v. *Stamford,* supra, 250 Conn. 598; *Kudlacz* v. *Lindberg Heat Treating Co.,* supra, 250 Conn. 590–91. We, therefore, conclude that the commission's failure to comply strictly with statutorily prescribed methods of notice and service under § 31-321 will not trigger a party's obligation to file an appeal under § 31-301 (a).[12] Accordingly, the board properly denied Atlantic Mutual's motion to dismiss the appeal.

### III

### THE AVAILABILITY OF APPORTIONMENT UNDER § 31-349

We now turn to Atlantic Mutual's claims that the board improperly concluded that it is precluded from seeking apportionment under the common law. Specifically, Atlantic Mutual contends that the board improperly determined that: (1) § 31-349 abrogated common-law apportionment in second injury cases; and (2) that § 31-349 (d), which closed the second injury fund to new claims, requires the insurer at the time of the second injury to retain sole liability for a claimant's second injury. We disagree with these contentions.

---

[12] We previously have recognized the potential inequities arising under our interpretation of § 31-301, noting that " 'the possibility that a case may arise in the future in which notice is received so late in the ten day period that the time to appeal is severely compressed. Such a case can be addressed if and when it arises.' " *Kudlacz* v. *Lindberg Heat Treating Co.,* supra, 250 Conn. 590, quoting *Kudlacz* v. *Lindberg Heat Treating Co.,* 49 Conn. App. 1, 12, 712 A.2d 973 (1998) (*Spear, J.,* dissenting). Both Fireman's Fund and Atlantic Mutual have briefed the issue of whether Fireman's Fund had meaningful notice and opportunity to appeal in light of its notice of the commissioner's decision one day prior to the expiration of the ten day appeal period. We do not reach this issue, however, because we conclude that the fax was not proper notice under § 31-321.

A

We recognize that the legislature does not act in a vacuum; accordingly, consideration of the historical circumstances surrounding enactments informs our determination of the legislature's policy goals. Our review of the circumstances surrounding the enactment of, and subsequent modifications to, the second injury fund legislation provides us with valuable insight into whether the legislature intended: (1) § 31-349 to abrogate common-law apportionment; and (2) by closing the second injury fund to new claims in § 31-349 (d), to require the insurer at the time of the second injury to become solely liable for that claim. Accordingly, we consider case law in existence when the legislation was enacted because "[w]e have repeatedly observed that traditional common law principles can inform the General Statutes and can assist us in determining how the statutes are to be interpreted and applied." *Rich-Taubman Associates* v. *Commissioner of Revenue Services*, 236 Conn. 613, 620, 674 A.2d 805 (1996).

Our historical perspective on second injury liability begins with this court's decision in *Mages* v. *Alfred Brown, Inc.*, 123 Conn. 188, 193 A. 780 (1937), which was decided after the enactment of the Workers' Compensation Act, but prior to the creation of the second injury fund. In *Mages*, the claimant sustained separate compensable injuries on two occasions, one, to his spine, while working for a coal company in 1935, and the other, to his left shoulder and back, while working for an oil delivery company in 1936. Id., 190. The coal company fully compensated the claimant for his 1935 injury. Id. At the time of his second injury, the claimant had not fully recovered from the first injury. Id. The commissioner had concluded that the existing damage from the already-compensated first injury was a substantial contributing factor to the disability resulting from the second injury. Id. This court held that the

second employer was solely responsible for compensating the claimant for all of the consequences of the second injury, concluding that the first employer already had "compensated him in full for the first injury and . . . is not liable for the present disability, caused solely by the second accident." Id., 195. In so holding, the court distinguished the earlier decision in *Plecity* v. *McLachlan Hat Co.*, 116 Conn. 216, 164 A. 707 (1933), which allowed common-law apportionment in a case where "three insurers had issued successive policies, each covering part of a period of employment extending over several years; the plaintiff suffered a single injury [mercury poisoning] to which his employment during the entire period materially contributed; and . . . held that the policies were to be construed to impose liability upon all three of them." *Mages* v. *Alfred Brown, Inc.*, supra, 195. The court emphasized, in *Mages*, the distinction between the two separate compensable injuries sustained on different occasions at issue in that case, and the single injury suffered over an extended period of time in *Plecity*.[13] Id. This court's decision in *Mages* also reflected the general guiding principle of workers' compensation law, that "compensation does not depend upon the condition of health of the employee or upon his freedom from liability to injury through a constitutional weakness or latent tendency. If the injury is the cause of the disability, it is compensable even though such an injury might not have caused the disabil-

---

[13] In *Plecity*, we relied on common-law principles applicable to joint tortfeasors to conclude that the claimant could recover the full amount for his injury from any of the insurers. *Plecity* v. *McLachlan Hat Co.*, supra, 116 Conn. 226. We deemed the determination of the appropriate apportionment to be a matter for separate proceedings between the insurers. Id., 227. Although the legislative history does not expressly refer to the decision, the board has noted in *Thomen* v. *Turri Electric*, 11 Conn. Workers' Comp. Rev. Op. 299, 302 (1993), that *Plecity* is considered a forerunner of the apportionment provisions in § 31-299b, which we now hold applies only to cases of occupational disease and repetitive trauma. See part IV of this opinion.

ity if occurring to a healthy employee or even an average employee." Id., 192. We have noted that, as a result of this general rule, "[e]mployers . . . hesitated to hire handicapped persons because if a previously injured or disabled employee were then injured on the job, the employer would be required to compensate the employee for the entire resulting disability even though the severity of the second injury might have been attributable substantially to the preexisting condition."[14] *Davis* v. *Norwich*, supra, 232 Conn. 319–20.

To address this problem, in 1945, "the legislature established the [second injury] fund, primarily to encourage the employment of persons with an existing disability and, at the same time, to provide adequate workers' compensation benefits for them." Id., 320. Its enactment was spurred by the return of injured World War II veterans to the workforce. 38 H.R. Proc., Pt. 16, 1995 Sess., p. 5946, remarks of Representative James O'Rourke. The second injury fund also was intended to "relieve employers from the hardship of liability for those consequences of compensable injury not attributable to their employment . . . especially considering that the combined effect of a successive injury to someone with a preexisting disability can far exceed the combined allowances for each injury existing separately." (Citations omitted; internal quotation marks omitted.) *Davis* v. *Norwich*, supra, 232 Conn. 320.

[14] In the 1920s, the legislature responded to this by amending the workers' compensation law to permit employers to condition the hiring of disabled workers on the "written waiver of any future compensation attributable to their physical defects." (Internal quotation marks omitted.) *Davis* v. *Norwich*, supra, 232 Conn. 320. These waivers protected employers, however, at the cost of leaving disabled workers vulnerable to a "total loss of income if they ever became completely disabled due to a second injury." Id. Subsequent amendments to the Workers' Compensation Act provided additional protection for employers by limiting liability for aggravation of preexisting diseases and providing specific indemnity for the loss of second limbs. See, e.g., *Fimiani* v. *Star Gallo Distributors, Inc.*, supra, 248 Conn. 643–44; *Mages* v. *Alfred Brown, Inc.*, supra, 123 Conn. 194.

"[U]nder the second injury scheme enacted in 1945, an employer was required to pay only that portion of benefits that were attributable to the second injury, and the fund was required to pay any compensation that was attributable to the claimant's prior injury." *Fimiani* v. *Star Gallo Distributors, Inc.*, supra, 248 Conn. 645. Liability was determined and apportioned on a case-by-case basis. Id., 646. The scope of the injuries covered under the original second injury fund legislation, however, was quite limited.[15]

The next major development occurred in 1952 with this court's decision in *Mund* v. *Farmers' Cooperative, Inc.*, supra, 139 Conn. 338. In *Mund*, the court held that liability for the claimant's injuries could be apportioned between his employer's first and second insurers. Id., 344. In *Mund*, the claimant sustained a back injury in 1946 that rendered him totally, but temporarily, disabled. Id., 340. The injury was diagnosed as a possible ruptured disc at the fourth and fifth lumbar interspace, complicated by existing "congenital anomalies." Id. The claimant's recovery was slow and, by January, 1950, he was diagnosed with a 15 percent permanent disability as a result of the 1946 injury. Id. In June, 1950, the

---

[15] The original second injury fund legislation provided in relevant part: "If an employee who has previously incurred, by accidental injury, disease or congenital causes, permanent partial incapacity by means of the total loss of, or the total loss of use of, one hand, one arm, one foot, one leg or one eye, or the reduction of sight in one eye to one-tenth or less of normal vision with glasses, sustains an injury for which compensation is provided under this chapter which results in permanent total incapacity by means of the loss of, or the loss of use of, another of said members, or eye, or the reduction of sight in the other eye to one-tenth or less of normal vision with glasses, he shall be paid compensation by his employer for such incapacity to work, and for the specific loss of, or loss of use of, any of said members or organ, due to the subsequent injury in accordance with the provisions of section 5237 as amended. After the completion of payments due from his employer, he shall be paid additional weekly compensation . . . . Such additional compensation shall be paid out of the fund . . . ." Public Acts 1945, No. 188, § 1; see *Fimiani* v. *Star Gallo Distributors, Inc.*, supra, 248 Conn. 644.

plaintiff sustained another accidental injury at work that reopened his original ruptured disc. Id., 341. The claimant's employer had different workers' compensation insurers in 1946 and 1950. Id., 340. The commissioner had concluded that the "two accidents were equal, concurrent and contributing causes of the plaintiff's disability since that date, the second injury being superimposed upon and an aggravation of the condition remaining from the first injury." Id., 341. This court accepted the commissioner's determination regarding causation and concluded that, on the facts, the claimant's injury in *Mund* was more analogous to the single injury with multiple insurers scenario of *Plecity*, wherein this court permitted apportionment, than to the two separate injuries of *Mages*, in which the second employer was solely liable.[16] Id., 344–45.

In 1959, and again in 1967, the legislature made significant changes to the second injury fund legislation. The 1959 amendment eliminated the enumerated list of eligible injuries, replacing it with the far more comprehensive terms of "preexisting incapacity" and "injury." See Public Acts 1959, No. 580, § 11. In 1967, the legislature streamlined the administrative process and attempted to eliminate the difficulties inherent in the existing case-by-case apportionment process by amending § 31-349 to limit the employer's liability for a second injury to a predetermined period of 104 weeks. See *Davis* v. *Norwich*, supra, 232 Conn. 320–21, citing Public Acts 1967, No. 842, § 20. "This allocation of liability was intended to charge the employer only with an approximation of those benefits attributable solely to the second, employment related injury," with the second injury fund assuming sole liability for benefits paid after the

---

[16] With the advantage of hindsight, we note that, even if the claimant's back injuries in *Mund* were deemed separate and distinct, the claimant's back injuries would not have qualified him for second injury fund relief in 1952. See footnote 15 of this opinion.

initial 104 weeks. *Davis* v. *Norwich*, supra, 320. This allocation reflected a legislative determination that benefits paid after 104 weeks would be attributable to the preexisting injury. *Fimiani* v. *Star Gallo Distributors, Inc.*, supra, 248 Conn. 646.

In 1995, the legislature, responding to the recommendation of a blue ribbon commission, closed the second injury fund to new claims in an effort to reduce the financial burden on the fund, which had, in the apt words of one representative, "become a major financial disaster or near-disaster that possibly threatened the future economic health of our state."[17] 38 H.R. Proc., supra, p. 5946, remarks of Representative O'Rourke; see also *Coley* v. *Camden Associates, Inc.*, 243 Conn. 311, 319, 702 A.2d 1180 (1997). The legislature amended subsection (d) of § 31-349 through No. 95-277, § 3, of the 1995 Public Acts (P.A. 95-277), which closed the second injury fund to claims for injuries occurring on or after July 1, 1995. Section 31-349 (d) provides in relevant part: "All such claims shall remain the responsibility of the employer or its insurer under the provisions of this section." When it enacted the 1995 amendment, during debate, the legislature implicitly acknowledged the policy behind the original second injury fund legislation, which was to prevent employment discrimination against the disabled. See 38 S. Proc., Pt. 15, 1995 Sess., p. 5485, remarks of Senator John Kissel; 38 H.R. Proc.,

---

[17] We further described the legislative history and circumstances surrounding the adoption of Public Acts 1995, No. 95-277 (P.A. 95-277) in *Coley* v. *Camden Associates, Inc.*, 243 Conn. 311, 319, 702 A.2d 1180 (1997): "The problems faced by the [second injury] fund at the time P.A. 95-277 . . . was adopted were grave. . . . '[T]he future liability of the Second Injury Fund approached almost six billion dollars . . . .' [38 H.R. Proc., supra, p. 5946, remarks of Representative O'Rourke.] Representative O'Rourke went on to note that transfers into the fund had increased from 425 cases in 1984 to 6755 in 1991, a 630 percent increase. Id., p. 5947. In the face of these sobering facts, the legislature unanimously passed P.A. 95-277 in an attempt to salvage the fund."

supra, p. 5946, remarks of Representative O'Rourke. Senator Kissel stated, however, that "the original reason for having the Second Injury Fund . . . no longer exists" because "[s]ince the end of World War II, many changes have taken place, not only in the State of Connecticut, but in the United States. We've had the Americans with Disabilities Act as well as many other state and federal laws which guarantee an individuals right to be hired, even if they have some sort of disability or handicap." 38 S. Proc., supra, p. 5485. With the benefit of this historical background, we now turn to the issue of whether the legislature intended (1) § 31-349 to abrogate common-law apportionment in second injury cases, and (2) by closing the second injury fund to new claims in § 31-349 (d), to require the insurer at the time of the second injury to become solely liable for that claim.

B

Atlantic Mutual claims that the board improperly concluded that common-law apportionment is no longer available to second injury employers and their insurers because it was abrogated by § 31-349. Specifically, Atlantic Mutual contends that, when second injury fund relief is not available, our decision in *Mund* v. *Farmers' Cooperative, Inc.*, supra, 139 Conn. 338, stands for the proposition that the second injury employer or its insurer may seek apportionment of liability with previous employers or insurers. Atlantic Mutual further claims that the board incorrectly interpreted our decision in *Fimiani* v. *Star Gallo Distributors, Inc.*, supra, 248 Conn. 645, as rendering the second employer solely liable for the consequences of the second injury. Finally, Atlantic Mutual maintains that precluding apportionment will frustrate the legislative objective of preventing disability-based employment discrimination. We disagree, and we address these contentions in turn.

We first address Atlantic Mutual's contention that our decision in *Mund* provides for common-law apportionment when second injury fund relief is unavailable. We disagree because *Mund* did not contemplate two separate and distinct injuries; rather, it was decided in a context involving aggravation of a *single preexisting* injury. *Mund* v. *Farmers' Cooperative, Inc.*, supra, 139 Conn. 344. In permitting apportionment of liability for the claimant's injuries, this court's application of common-law causation principles[18] led the court to conclude that the situation in *Mund* was much closer to the single progressive occupational disease found in *Plecity* v. *McLachlan Hat Co.*, supra, 116 Conn. 228, than to the separate and distinct injuries found in *Mages* v. *Alfred Brown, Inc.*, supra, 123 Conn. 195, wherein apportionment was not permitted. *Mund* v. *Farmers' Cooperative, Inc.*, supra, 344. We, therefore, characterize *Mund* as a repetitive trauma case, that, along with *Plecity*, served as part of the genesis of § 31-299b, *not* § 31-349. See footnote 13 of this opinion; see also part IV of this opinion. In light of this distinction, our preceding historical analysis, and the holding in *Mages* v. *Alfred Brown, Inc.*, supra, 195, we conclude that common-law apportionment between employers and insurers simply did not exist in a case of separate and distinct second injuries. Inasmuch as our inquiry is framed by the unchallenged factual conclusion that the plaintiff had in fact suffered two separate and distinct injuries to her left foot, no such apportionment is available in the present case.[19]

---

[18] In *Mund*, our analysis was based on the trial court's conclusion that the second accident was an "equal, concurrent, and contributing," rather than intervening, cause of the claimant's injuries. (Internal quotation marks omitted.) *Mund* v. *Farmers' Cooperative, Inc.*, supra, 139 Conn. 343. This finding allowed us to distinguish situations such as that in *Mages*, in which "there was no finding that the second injury consisted of a recurrence in the same spot, nor, in fact, did the finding show that there was any connection between the two injuries which the plaintiff sustained." Id., 344.

[19] In its opinion in this case, the board recognized that some of its prior opinions improperly characterized *Mund* as standing for the proposition

We next address Atlantic Mutual's claim that the board incorrectly interpreted our decision in *Fimiani* as rendering the second employer solely liable for the consequences of the second injury. We disagree. In *Fimiani*, we addressed the issue of whether § 31-349 permitted the "[second injury] fund to accept liability only for the portion of benefits due a claimant that is attributable solely to the claimant's second injury . . . ." *Fimiani* v. *Star Gallo Distributors, Inc.*, supra, 248 Conn. 642. We rejected the second injury fund's argument "that it is responsible for the portion of the benefits that is attributable only to the *second* injury . . . ." (Emphasis in original.) Id., 646. In making this argument, the second injury fund contended: "[T]he phrase [in § 31-349 (a)] 'less any compensation benefits payable or paid with respect to the previous disability' indicates an intention by the legislature to hold the first injury employer liable for compensation relating to the first injury." Id., 647. We rejected this claim, noting: "[B]y its terms, § 31-349 requires the employer at the time of the second injury to pay all benefits during the first 104 weeks of the claimant's disability. Thereafter,

that despite the existence of § 31-349, liability may be apportioned in the second injury scenario based on principles of causation. The board's leading case on the issue, *Jolicoeur* v. *L.H. Duncklee Refrigeration, Inc.*, 14 Conn. Workers' Comp. Rev. Op. 24, 27 (1995), stated: "The existence of these statutes [§ 31-299b and § 31-349] does not prevent a commissioner from making a finding that two separate accidents contributed to cause a particular injury, however, where both injuries are individually compensable. . . . We do not think the legislature intended § 31-349 to prevent an employer or insurer from being held partly responsible . . . for [the] direct consequences of a compensable injury where prior law, as demonstrated by *Mund*, would have allowed the apportionment of liability based on causation." The board subsequently followed *Jolicoeur* in *Milardo* v. *EIS/Div. Parker Hannifin*, 15 Conn. Workers' Comp. Rev. Op. 27, 31–32 (1995), and *Koczur* v. *Gedney*, 3051 CRB-8-95-3 (December 20, 1996). The board, in its opinion in the present case, overruled *Jolicoeur*, *Milardo* and *Koczur*, "insofar as they support such an apportionment," noting that § 31-349 was not in effect at the time *Mund* was decided.

the fund similarly is required to accept 'all responsibility' for the benefits due to the claimant."[20] Id., 643.

Although the second injury fund is not the party seeking apportionment in the present case, we conclude that the board properly relied on our reasoning in *Fimiani* when it concluded that the second injury employer and its insurer at the time of that injury were solely liable for the plaintiff's injuries. In *Fimiani*, we made clear the proposition that after the second injury employer or its insurer paid the claimant benefits for 104 weeks, the second injury fund became completely responsible for all of the benefits due to the claimant. Id., 651. Under *Fimiani*, the first employer or its insurer simply bears no responsibility for the consequences of the second injury. Taken in the context of § 31-349 (d), which provides that "[a]ll such claims shall remain the responsibility of the employer or its insurer," we conclude that the board's reliance on *Fimiani* was proper.

We further disagree with Atlantic Mutual's contention that precluding apportionment will frustrate the legislative objective of preventing disability-based employment discrimination. "Statements of legislators often provide strong indication of legislative intent." (Internal quotation marks omitted.) *State* v. *Ehlers*, 252 Conn. 579, 593, 750 A.2d 1079 (2000). The legislative history indicates that, on closing the second injury fund to new claims, the legislature contemplated the second injury employer or its insurer remaining solely liable for the consequences of the second injury.[21] During the House

---

[20] In *Fimiani*, we concluded that the statutory language at issue was intended to prevent claimants from recovering duplicative compensation for their first work-related injury. *Fimiani* v. *Star Gallo Distributors, Inc.*, supra, 248 Conn. 648.

[21] The legislature only addressed apportionment in the context of the amount of benefits that the second injury fund pays to employees *concurrently* working two different jobs. See P.A. 95-277, § 2, codified at General Statutes § 31-310; see also 38 S. Proc., supra, pp. 5486–87, remarks of Senator Kissel ("we make it clear that if one is injured and there's concurrent employment, where an employee is working two different jobs, that there

debate on P.A. 95-277, Representative O'Rourke stated: "[W]e close the fund to the vast majority of claims that it now accepts, returning these cases to the regular Workers' Compensation system where they belong." 38 H.R. Proc., supra, p. 5948. We also infer this intent from the continuing concern expressed by certain legislators about preventing employment discrimination, as well as their recognition that employers are now bound by antidiscrimination laws[22] that did not exist when the second injury fund legislation first was enacted. See 38 S. Proc., supra, p. 5485, remarks of Senator Kissel. In light of these facts, we conclude that precluding apportionment in second injury cases does not undermine the legislature's objective of preventing employment discrimination on the basis of physical disability.

### C

Atlantic Mutual also claims that the board improperly concluded that § 31-349 (d) renders the employer or its insurer at the time of the second injury solely liable for the claim. We disagree. We reach this conclusion based on our reading of the language of § 31-349 (d) in the context of the entire Workers' Compensation Act, as well as our review of the pertinent legislative history.

"As with any issue of statutory interpretation, our initial guide is the language of the statutory provisions." (Internal quotation marks omitted.) *Shawhan* v. *Langley*, 249 Conn. 339, 344, 732 A.2d 170 (1999); see also *State* v. *Courchesne*, supra, 262 Conn. 564. "[S]tatutes

will be a fair apportionment based upon the two jobs that the individual's working, so that only the right amount is transferred into the Second Injury Fund").

[22] General Statutes § 46a-60, the state antidiscrimination law, has a far broader application than the federal Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq. (2000). For example, the state antidiscrimination laws apply to employers with three or more employees; see General Statutes § 46a-51 (10); whereas the ADA applies only to employers with fifteen or more employees. See 42 U.S.C. § 12111 (5) (A).

must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant." (Internal quotation marks omitted.) *Nizzardo* v. *State Traffic Commission*, 259 Conn. 131, 158, 788 A.2d 1158 (2002). We presume that when the legislature enacted § 31-349 (d), it was aware of and considered the language contained in the other provisions of the Workers' Compensation Act. See *M. DeMatteo Construction Co.* v. *New London*, 236 Conn. 710, 717, 674 A.2d 845 (1996). "[W]e are guided by the principle that the legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires us to read statutes together when they relate to the same subject matter . . . ." (Internal quotation marks omitted.) *Pantanella* v. *Enfield Ford, Inc.*, 65 Conn. App. 46, 55, 782 A.2d 141, cert. denied, 258 Conn. 930, 783 A.2d 1029 (2001). Accordingly, "[i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction." *Schiano* v. *Bliss Exterminating Co.*, 260 Conn. 21, 42, 792 A.2d 835 (2002). "Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed. . . . That tenet of statutory construction is well grounded because [t]he General Assembly is always presumed to know all the existing statutes and the effect that its action or non-action will have upon any one of them." (Internal quotation marks omitted.) *M. DeMatteo Construction Co.* v. *New London*, supra, 717. "We have previously recognized that our construction of the Workers' Compensation Act should make every part operative and harmonious with every other part insofar as is possible . . . . In applying these principles, we are mindful that the legislature is presumed

to have intended a just and rational result." (Internal quotation marks omitted.) *Schroeder* v. *Triangulum Associates*, 259 Conn. 325, 339, 789 A.2d 459 (2002).

The relevant language of § 31-349 (d) provides: "All such claims *shall remain the responsibility* of the employer or its insurer . . . ." (Emphasis added.) Atlantic Mutual contends that, although this provision renders the second injury employer or its insurer liable for the second injury, it does not preclude apportionment because it does not state "who is to pay the entire disability." We disagree with this interpretation because, in § 31-299b, the legislature explicitly provided for an apportionment scheme in the single injury and multiple employer or insurer scenario. See General Statutes (Rev. to 1999) § 31-299b; see also part IV of this opinion. The relevant apportionment language in General Statutes (Rev. to 1999) § 31-299b provides that "the employer who last employed the claimant prior to the filing of the claim, or the employer's insurer, shall be *initially liable* for the payment of such compensation. . . ." (Emphasis added.) That statute then sets out an elaborate mandatory fact-finding and apportionment procedure for the commissioner to follow should the commissioner issue an award pursuant to that section.

In comparison, § 31-349 (d) is completely devoid of even the suggestion of any such procedure or language. Moreover, when the legislature enacted § 31-349 (d), § 31-299b and its apportionment scheme already had been in existence for approximately fifteen years. We also note that, although the legislative history of § 31-349 (d) reflects the General Assembly's concern about disability-based employment discrimination, the recorded history is completely silent about apportionment as a means of preventing such discrimination. See 38 S. Proc., supra, p. 5485, remarks of Senator Kissel; 38 H.R. Proc., supra, p. 5948, remarks of Representative O'Rourke; see also footnote 21 of this opinion. As

"[r]elated statutory provisions, or statutes in pari materia, often provide guidance in determining the meaning of a particular word [or phrase]"; (internal quotation marks omitted) *Stuart* v. *Dept. of Correction*, 221 Conn. 41, 45–46, 601 A.2d 539 (1992); the absence of apportionment language in § 31-349 (d), taken in the context of the Workers' Compensation Act in its entirety, leads us to determine that the legislature, in enacting § 31-349 (d), intended that the last employer be solely liable for the benefits of the second injury. We, therefore, conclude that apportionment is not an available form of relief for the second injury employer or its insurer under § 31-349 (d).

## IV

### THE AVAILABILITY OF APPORTIONMENT UNDER § 31-299b

Finally, we address Atlantic Mutual's claim that the board improperly concluded that the apportionment scheme under § 31-299b applies only to cases of repetitive trauma or occupational disease, and not to situations where the claimant suffers two entirely separate and distinct injuries. We disagree and conclude that the application of § 31-299b is limited to cases of ongoing repetitive trauma or occupational disease.

General Statutes (Rev. to 1999) § 31-299b provides in relevant part: "If an employee suffers an *injury or disease* for which compensation is found by the commissioner to be payable according to the provisions of this chapter, the employer who last employed the claimant prior to the filing of the claim, or the employer's insurer, shall be *initially liable* for the payment of such compensation. . . ." (Emphasis added.) The issue presented, therefore, is whether the legislature intended the term "injury or disease," as used in § 31-299b, to apply only to single instances of occupational diseases and repetitive trauma, and not to the consequences of

separate injuries on separate occasions. We conclude that the legislature so intended.

Our conclusion as to the legislature's intent finds ample support in the language of the section, the pertinent legislative history, and the canons of statutory construction. "As with any issue of statutory interpretation, our initial guide is the language of the statutory provisions." (Internal quotation marks omitted.) *Shawhan* v. *Langley*, supra, 249 Conn. 344; *State* v. *Courchesne*, supra, 262 Conn. 564. We note that the pertinent language of § 31-299b, "an injury or disease," uses nouns in the singular, rather than the plural. This choice of language suggests that the legislature contemplated a scenario of multiple employers or insurers bearing responsibility for a single injury suffered by an employee—i.e., an occupational disease that developed over the course of an employee's career. Cf. *Shawhan* v. *Langley*, supra, 344 ("[t]he language of the [offer of judgment] statute, which is framed in the singular, suggests, albeit not unambiguously or conclusively, that the statute contemplates one offer of judgment").

Moreover, the legislative history of § 31-299b indicates that the legislature intended the statute to apply only to occupational diseases and repetitive trauma. "Statements of legislators often provide strong indication of legislative intent." (Internal quotation marks omitted.) *State* v. *Ehlers*, supra, 252 Conn. 593. In debates on the bill in the Senate shortly before it was adopted, Senator Michael J. Skelley, then chairman of the labor committee, explained that the statute was intended to secure rapid, full compensation for employees in injury cases where there are multiple employers or insurance carriers.[23] 24 S. Proc., Pt. 5, 1981 Sess., p.

---

[23] Senator Skelley noted that "[i]n many instances, the individual has gone for months, years, and in some instances I'm sorry to say, that the claimant has died before the litigation between the parties to determine how much each carrier or employer is going to pay is determined." 24 S. Proc., Pt. 5, 1981 Sess., p. 1416.

1416. Senator Skelley also expressly referred to the problems that coverage disputes created, "particularly [in] occupational disease case[s]." Id. In further explaining the bill and its apportionment provision, Senator Skelley used an example of a construction employee developing mesothelioma as a result of multiple exposures to asbestos. Id., p. 1418.

Moreover, "[i]t is now well settled that testimony before legislative committees may be considered in determining the particular problem or issue that the legislature sought to address by the legislation. . . . This is because legislation is a purposive act . . . and, therefore, identifying the particular problem that the legislature sought to resolve helps to identify the purpose or purposes for which the legislature used the language in question." (Internal quotation marks omitted.) *Matey* v. *Estate of Dember*, 256 Conn. 456, 484–85, 774 A.2d 113 (2001). In the present case, testimony before the joint standing labor committee indicates that the legislature was contemplating single injuries or illnesses. For example, Betty Tianti, then secretary-treasurer of the Connecticut AFL-CIO, testified that the bill "speaks to one of the problems . . . insofar as the asbestos count is concerned. In the case of occupational illnesses, quite often the gestation comes over a long period of time . . . . Or, in the case of repetitive trauma . . . you have a period of maybe ten, 15, 20 years, at which time you could have changed your job or the employer could have changed a carrier and you come to a point in time where the illness or the injury is definitely determined to be work related." Conn. Joint Standing Committee Hearings, Labor and Public Employees, Pt. 2, 1981 Sess., p. 340. In explaining his organization's position opposing the bill's apportionment provision, Douglas Barnert, regional vice president of the Alliance of American Insurers, made multiple references to "occupational disease claims"

and multiple exposures. Id., p. 355. Indeed, a colloquy between Barnert and Senator Skelley refers, by way of example, to silicosis, an occupational disease. See id., p. 358. All other recorded testimony discusses the bill's impact in addressing multiple exposures in occupational disease cases and does not mention separate instances of injury. See id., p. 358, remarks of John Anderson, counsel to the Connecticut Business Administrative Association; id., p. 378, remarks of James Brown, general counsel to the Insurance Association of Connecticut. The totality of the testimony taken by the labor committee indicates that, when the legislature enacted § 31-299b, it contemplated single injuries resulting from multiple exposures, such as repetitive trauma and occupational disease, not two or more entirely separate and identifiable injuries.

Our conclusion that the legislature intended § 31-299b to cover only single injuries or illnesses is buttressed by our long-standing "[presumption] that laws are enacted in view of existing relevant statutes . . . and that [s]tatutes are to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a consistent body of law." (Internal quotation marks omitted.) *Matey* v. *Estate of Dember*, supra, 256 Conn. 480. When § 31-299b was enacted in 1981, § 31-349 had already been in effect for many years. The problem, therefore, of properly compensating employees who had suffered multiple, but separate and identifiable, injuries had, since 1945, been addressed under § 31-349 by the second injury fund. See, e.g., *Fimiani* v. *Star Gallo Distributors, Inc.*, supra, 248 Conn. 643 (exploring legislative history). It follows that when the legislature enacted § 31-299b, its sole goal was to address the situation wherein an employee, suffering from a single occupational illness or repetitive trauma occasioned by multiple hazard exposures, was not receiving prompt and adequate

compensation as a result of coverage disputes between employers or insurers. The legislature did not intend the scope of § 31-299b to include the very different situation that was addressed already by second injury legislation.

Atlantic Mutual contends that the general definition of " 'injury' " provided by General Statutes § 31-275 (16) (A), indicates that the legislature did not intend to limit the applicability of § 31-299b to repetitive trauma or occupational disease cases. We disagree. Section 31-275 (16) (A) provides: " 'Personal injury' or 'injury' includes, in addition to accidental injury which may be definitely located as to the time when and the place where the accident occurred, an injury to an employee which is causally connected with his employment and is the direct result of repetitive trauma or repetitive acts incident to such employment, and occupational disease." Limiting the application of § 31-299b to cases of repetitive trauma or occupational disease, however, is not inconsistent with this definition. Common sense dictates that apportionment between various insurers or employers, as provided under § 31-299b, is unnecessary when the time and place of an accidental injury may be pinpointed.[24] Cf. *Connor* v. *Statewide Grievance Committee*, 260 Conn. 435, 439, 797 A.2d 1081 (2002) ("[i]n construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended" [internal quotation marks omitted]). Moreover, other definitions in § 31-275 expressly contemplate the second injury scenario in the present case by discussing terms such as " '[p]revious disability,' " " '[s]econd disability,' " and " '[s]econd injury.' "

---

[24] By contrast, we have noted that "the process of injury from a repetitive trauma is ongoing until [the last date of exposure] . . . and, in many cases . . . the very nature of the injury will make it impossible to demarcate a specific date of injury." (Citation omitted; internal quotation marks omitted.) *Russell* v. *Mystic Seaport Museum, Inc.*, 252 Conn. 596, 613, 748 A.2d 278 (2000).

See General Statutes § 31-275 (20), (22) and (23).[25] "We have previously recognized that our construction of the Workers' Compensation Act should make every part operative and harmonious with every other part insofar as is possible . . . ." (Internal quotation marks omitted.) *Schroeder* v. *Triangulum Associates*, supra, 259 Conn. 339. We, therefore, reject Atlantic Mutual's argument that the definition of " 'injury' " under § 31-275 (16) (A) expands § 31-299b beyond a single instance of repetitive trauma or occupational disease. In light of the statute's language, legislative history and place within the workers' compensation statutory scheme, we conclude that the board properly determined that § 31-299b is applicable only to single instances of occupational disease or repetitive trauma and, therefore, properly refused to invoke the apportionment provision of § 31-299b.

The decision of the board is affirmed.

In this opinion BORDEN, KATZ and VERTEFEUILLE, Js., concurred.

BORDEN, J., concurring. I fully agree with and join the well reasoned majority opinion. I write separately solely to express my doubt about the viability, if any, of the concept of common-law apportionment in the context of our Workers' Compensation Act.[1]

---

[25] General Statutes § 31-275 provides in relevant part: "(20) 'Previous disability' means an employee's preexisting condition caused by the total or partial loss of, or loss of use of, one hand, one arm, one foot or one eye resulting from accidental injury, disease or congenital causes, or other permanent physical impairment.

"(21) 'Scar' means the mark left on the skin after the healing of a wound or sore, or any mark, damage or lasting effect resulting from past injury.

"(22) 'Second disability' means a disability arising out of a second injury.

"(23) 'Second injury' means an injury, incurred by accident, repetitive trauma, repetitive acts or disease arising out of and in the course of employment, to an employee with a previous disability."

[1] I recognize that, as the majority opinion discloses, it is not necessary to examine that question in the present case, because this case does not squarely present it, and I fully agree with that wise approach.

The concept apparently stems from this court's somewhat Delphic decision in *Mund* v. *Farmers' Cooperative, Inc.*, 139 Conn. 338, 344, 94 A.2d 19 (1952), in which we appeared to approve of common-law notions of apportionment of liability among employers and insurers. Since then, however, we repeatedly have stated that workers' compensation law is purely a matter of statute. See, e.g., *Cantoni* v. *Xerox Corp.*, 251 Conn. 153, 159–60, 740 A.2d 796 (1999); *Discuillo* v. *Stone & Webster*, 242 Conn. 570, 576, 698 A.2d 873 (1997). We also have seen the broad expansion, and then the contraction, of the second injury fund, as well as various other workers' compensation statutes addressing specific apportionment questions. To the extent, therefore, that *Mund* permitted a workers' compensation commissioner to employ common-law, as opposed to statutory, concepts of apportionment, I have grave doubts as to its continued viability.

ZARELLA, J., concurring. I concur in the result reached by the majority but write separately because I disagree with the majority's analysis. The majority opinion provides a textbook example of the *Courchesne*[1] approach to statutory interpretation under which a court "pick[s] and choose[s] from among various tools of interpretation"; *State* v. *Courchesne*, 262 Conn. 537, 621, 816 A.2d 562 (2003) (*Zarella, J.*, with whom *Sullivan, C. J.*, joins, dissenting); instead of focusing on the plain language of the statute under interpretation. In my view, the application of that philosophy makes this otherwise very simple case needlessly confusing. Specifically, the *Courchesne* methodology induces the majority to engage in a lengthy analysis of the genealogy of the workers' compensation statute at issue, the common law and the statute's legislative history that ultimately is rendered moot by virtue of the majority's conclusion based on the statute's text.

---

[1] *State* v. *Courchesne*, 262 Conn. 537, 816 A.2d 562 (2003).

The majority states that the primary questions in this case are: (1) whether General Statutes § 31-349 abrogates common-law apportionment between workers' compensation insurance carriers; and (2) whether § 31-349 (d), which closed the second injury fund to the transfer of claims for injuries occurring on or after July 1, 1995, renders the workers' compensation insurance carrier, at the time of an employee's injury, solely liable for disability payments made in connection with that injury, when that injury, although separate and distinct from a previous injury, had been aggravated by the previous injury. See part III of the majority opinion.

If, as the majority concludes, the answer to the second question is yes, then the first question is irrelevant. I simply fail to see how the majority, having concluded that § 31-349 (d) renders "the last employer . . . solely liable for the benefits of the second injury," possibly could conclude that common-law apportionment nevertheless is possible under § 31-349. In other words, the majority, quite sensibly, determines that the text of § 31-349 (d), which provides that "[a]ll [second injury] claims shall remain the responsibility of the employer or its insurer," and the lack of any statutory apportionment procedure in § 31-349 lead to the conclusion that "the legislature, in enacting § 31-349 (d), intended that the last employer be solely liable for the benefits of the second injury." In light of this conclusion, how could there possibly be any common-law apportionment that would allow the last employer to avoid sole liability for the benefits of the second injury?[2]

---

[2] To the extent that the majority suggests that, notwithstanding the expressed legislative intent in § 31-349 (d) to render the second employer solely liable, there still is a possibility of *common-law* apportionment, I disagree. Such reasoning is akin to the reasoning that this court employed in *Bhinder* v. *Sun Co.*, 246 Conn. 223, 717 A.2d 202 (1998), in which the court recognized a common-law action for apportionment between negligent and intentional tortfeasors notwithstanding the fact that the negligence apportionment statute did not provide for such apportionment. Id., 230, 234. The legislature promptly responded to our holding in *Bhinder* by enacting

Despite the simplicity of this textual conclusion, however, which the majority finally reaches in part III of its opinion, the majority engages in an extensive discussion of the circumstances surrounding the enactment of and subsequent modifications to § 31-349, case law, legislative history and genealogy prior to concluding that "common-law apportionment is no longer available to second injury employers . . . ." Although I share Justice Borden's doubts concerning the viability of the apportionment principles enunciated by this court in *Mund* v. *Farmers' Cooperative, Inc.*, 139 Conn. 338, 344–45, 94 A.2d 19 (1952), surely, apportionment is no longer available in light of the majority's conclusion that "the legislature, in enacting § 31-349 (d), intended that the last employer be solely liable for the benefits of the second injury."

In my view, the majority's holistic approach to statutory interpretation under which all factors are considered does little more than cloud its own textual analysis and conclusions. What would the majority have done if it had determined that *Mund* provided for common-law apportionment? Would it have disregarded its conclusion that the legislature provided that the second employer shall be solely liable? Such are the questions engendered by an approach to statutory interpretation that fails to pay proper heed to the fundamental role that a statute's text plays in its interpretation.

---

Public Acts 1999, No. 99-69, § 1, which precluded, inter alia, apportionment between negligent and intentional tortfeasors in civil actions pending or filed on or after August 11, 1998, the date on which this court released its decision in *Bhinder*. See, e.g., *Allard* v. *Liberty Oil Equipment Co.*, 253 Conn. 787, 801–803, 756 A.2d 237 (2000).