HARRY KRAIZA, JR. *v.* PLANNING AND ZONING COMMISSION OF THE TOWN OF HARTLAND
(AC 30836)

Gruendel, Beach and Borden, Js.

Argued December 3, 2009—officially released June 8, 2010

*Robert J. Reeve,* for the appellant (plaintiff).

*Mary E. R. Bartholic,* with whom, on the brief, was *Thomas W. Witherington,* for the appellee (named defendant).

*Opinion*

GRUENDEL, J. The plaintiff, Harry Kraiza, Jr., appeals from the judgment of the trial court dismissing his appeal from the denial of his subdivision application

by the defendant planning and zoning commission of the town of Hartland (commission).[1] On appeal, the plaintiff claims that the court improperly (1) affirmed the commission's determination that the length of East-wood Drive should be considered when evaluating his application, (2) affirmed the commission's finding that Eastwood Drive is a dead-end street and (3) rejected his claim that the commission arbitrarily reinterpreted its regulations when considering his application. We affirm the judgment of the trial court.

The record reveals the following facts and procedural history. On or about June 11, 2007, the plaintiff filed an application with the commission seeking approval of a proposed eight lot subdivision on his 19.57 acre property, located in the town of Hartland. The east side of the plaintiff's property adjoins Hartland's boundary with the town of Granby. The south side of the plaintiff's property adjoins the Eastwood subdivision. Access to the lots in the Eastwood subdivision is provided by Eastwood Drive, a permanent dead-end street, which was approved as part of that subdivision plan. East-wood Drive intersects with Route 20 and extends into the Eastwood subdivision for approximately 850 feet, where it divides into two sections forming a loop. Ten lots are located on the outside of the loop and four lots within it. The total length of Eastwood Drive, including the loop, is approximately 3500 feet. Included on the Eastwood final subdivision plan is a fifty foot wide reserve strip labeled "Reserved For Future Road," which runs from the loop section of Eastwood Drive to the boundary of the plaintiff's property.[2] The plaintiff's

---

[1] Prior to trial, the court granted the motion to intervene as a defendant that was filed by Roy Champagne, an owner of property abutting that of the plaintiff. Because Champagne is not a party to this appeal, we refer in this opinion to the commission as the defendant.

[2] Section I-1E of the Hartland subdivision regulations provides: " 'Reserve Strip' shall mean and include areas for which future public use is intended for street connections and for street or pedestrian ways giving access to land dedicated to public use."

proposal included a dead-end street, Hazel Lane, to provide access to the lots by connecting to Eastwood Drive over the reserve strip. Hazel Lane extends approximately 1100 feet into the subdivision, forming a cul-de-sac.

Section I-6A-2 of Hartland's subdivision regulations (regulations) provides in relevant part: "Arrangement of streets shall provide for the continuation of the principal streets in adjoining subdivision, or for their proper projection when adjoining property is not subdivided. Permanent dead-end streets shall not exceed 1200 feet in length and shall be equipped with a turn-around roadway with a minimum radius of forty-five (45) feet for the outside curb at the closed end. . . ." Hartland Subdivision Regs., § I-6A-2. Additionally, the regulations define a "dead-end street" in § I-1J as "any street described in paragraph D of this section which is used for access to any current lot of record, and which presently provides only one means of ingress or egress."[3] Id., § I-1J.

The commission hired Martin J. Connor, a planning consultant, to offer his expert opinion as to whether the plaintiff's proposal complied with the regulations. Connor opined that Hazel Lane did comply with the 1200 foot regulatory limitation for permanent dead-end streets because it measured only 1100 feet in length. He further opined that the length of Hazel Lane should not be combined with that of Eastwood Drive when assessing whether the plaintiff's proposal complied with the regulations.

---

[3] Section I-1D of the regulations provides: " 'Street' shall mean and include any right-of-way dedicated and accepted for public travel, and any right-of-way recorded in the Land Records of the Town of Hartland, which is used or to be used for public access to (a) any lot of record or (b) any lot sold or set apart in accordance with the Zoning Regulations and amendments thereto."

Notwithstanding Connor's recommendation, and after concluding a public hearing on November 19, 2007, that had extended over multiple evenings, the commission, on January 17, 2008, unanimously voted to deny the plaintiff's application, finding that it was in violation of §§ I-1J and I-6A-2 of the regulations because Eastwood Drive and Hazel Lane combined to form an extended dead-end street with a total length exceeding the 1200 foot regulatory limitation. The plaintiff appealed to the Superior Court, which, on December 17, 2008, affirmed the commission's denial of his application.[4] This court subsequently granted the plaintiff's petition for certification to appeal. This appeal followed.

I

The plaintiff first claims that the court improperly affirmed the commission's determination that the length of Eastwood Drive must be added to that of Hazel Lane when considering his application.[5] We disagree.

The following additional facts and procedural history are necessary to our analysis. The plaintiff argued before the court that the commission was prohibited from considering the length of existing streets when determining whether Hazel Lane complied with the 1200 foot regulatory limitation. Instead, according to the plaintiff, the regulations permitted the commission to consider only the length of newly constructed streets. The court rejected the plaintiff's claim, reasoning that it was inconsistent with the plain language and intent of the regulations, and that it would lead to absurd results. Specifically, the court stated that "[t]here is

---

[4] A neighboring property owner, Roy Champagne, who was permitted to intervene as a defendant, claimed that the subdivision boundaries extended onto his property and that he should have been included in the application. The court rejected his claim. Those findings are not challenged on appeal.

[5] The dissent misconstrues this issue as "whether Eastwood Drive is a dead-end street . . . ."

nothing in the [r]egulations which says that when additions are made to an existing road, each new addition is considered a new road for purposes of the 1200 foot limitation. If this were not so, a developer could avoid the 1200 foot limitation by adding to a dead-end road in sections which never exceed 1200 feet. This could create a dead-end street of great length . . . ." On appeal, the plaintiff repeats this claim. He further contends that § I-6A is a design and construction standard placed in a section that regulates the building of newly proposed dead-end streets. According to the plaintiff, because Eastwood Drive is an already existing street, the commission improperly considered its length in assessing whether Hazel Lane complied with the regulations. Alternatively, the plaintiff argues that even if we were to conclude that the regulations do not apply only to newly proposed dead-end streets, the regulations are ambiguous and, thus, must be construed in his favor. See *Farrior* v. *Zoning Board of Appeals*, 70 Conn. App. 86, 90, 796 A.2d 1262 (2002) ("[w]here more than one interpretation of language is permissible, restrictions upon the use of lands are not to be extended by implication . . . [and] doubtful language will be construed against rather than in favor of a [restriction]" [internal quotation marks omitted]).

We now identify the applicable standard of review. "Because the interpretation of the regulations presents a question of law, our review is plenary. . . . Additionally, zoning regulations are local legislative enactments . . . and, therefore, their interpretation is governed by the same principles that apply to the construction of statutes. . . . Moreover, regulations must be interpreted in accordance with the principle that a reasonable and rational result was intended . . . . The process of statutory interpretation involves the determination of the meaning of the statutory language [or . . . the relevant zoning regulation] as applied to the facts of the

case, including the question of whether the language does so apply. . . .

"[O]rdinarily, this court affords deference to the construction of a [regulation] applied by the administrative agency empowered by law to carry out the [regulation's] purposes. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight . . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when [an] agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . [I]t is for the courts, and not administrative agencies, to expound and apply governing principles of law. . . .

"Finally, we note that a court that is faced with two equally plausible interpretations of regulatory language . . . properly may give deference to the construction of that language adopted by the agency charged with enforcement of the regulation. . . . Thus, in construing regulations, our function is to determine the expressed legislative intent. . . . Moreover . . . the words employed therein are to be given their commonly approved meaning." (Citations omitted; internal quotation marks omitted.) *Trumbull Falls, LLC* v. *Planning & Zoning Commission*, 97 Conn. App. 17, 21–23, 902 A.2d 706, cert. denied, 280 Conn. 923, 908 A.2d 545 (2006).

In considering the plaintiff's first argument that the plain language and context of the regulations demonstrate that they apply only to newly proposed streets, preliminarily, we note that the regulations at issue have

not previously been subject to judicial scrutiny. Moreover, the commission did not indicate that it had applied a time-tested interpretation of the regulations. As such, we do not defer to the commission and exercise plenary review.

We begin with the text of the regulations. Section I-6A provides in relevant part: "Private streets, meaning streets not already dedicated and accepted for public travel by the State of Connecticut or by the Town of Hartland, shall be constructed according to [certain specifications]. . . ." As noted previously, § I-6A-2 provides in relevant part: "Arrangement of streets shall provide for the continuation of the principal streets in adjoining subdivision, or for their proper projection when adjoining property is not subdivided. Permanent dead-end streets shall not exceed 1200 feet in length and shall be equipped with a turn-around roadway with a minimum radius of forty-five (45) feet for the outside curb at the closed end. . . ." Hartland Subdivision Regs., § I-6A-2. Additionally, § I-1J defines a "dead-end street" as "any street described in paragraph D of this [s]ection which is used for access to any current lot of record, and which presently provides only one means of ingress or egress." Id., § I-1J. We note that nowhere in the regulations is there any mention of dead-end streets constructed in stages or additions made to existing dead-end streets. At the same time, the regulations do not expressly state that they apply only to newly proposed streets.

The plaintiff argues that the plain language of the regulations demonstrates that they apply only to newly proposed streets. He also argues that because the regulations neither expressly permit nor prohibit the commission from adding the length of existing streets to proposed streets, the commission cannot construe them as such. See *Buttermilk Farms, LLC* v. *Planning & Zoning Commission*, 292 Conn. 317, 327, 973

A.2d 64 (2009) ("because subdivision regulations adopted by a planning and zoning commission are in derogation of common-law property rights, the scope of the enabling statute granting the power to adopt such regulations should not be extended by construction beyond the fair import of its language, or to include by implication that which is not clearly within its express terms"). Even if we were to interpret the regulations as applying only to new streets, we agree with the court that interpreting the regulations in the manner advanced by the plaintiff does not comport with common sense and would lead to absurd and unreasonable results. Under such an interpretation, individual sections measuring less than 1200 feet continuously could be added to an existing dead-end street, comply with the regulations and combine to form a single dead-end street of interminable length. Interpreting the regulations in this manner would create a loophole rendering meaningless § I-6A-2. See *Doyen* v. *Zoning Board of Appeals*, 67 Conn. App. 597, 605, 789 A.2d 478 (language of regulation construed so no clause or provision considered superfluous, void or insignificant), cert. denied, 260 Conn. 901, 793 A.2d 1088 (2002). Moreover, we must presume that a reasonable and rational result was intended by Hartland in enacting § I-6A-2. See *Spero* v. *Zoning Board of Appeals*, 217 Conn. 435, 441, 586 A.2d 590 (1991) (must use common sense in construing regulation and assume rational and reasonable result intended by local legislative body); *Prioli* v. *State Library*, 64 Conn. App. 301, 308, 780 A.2d 172 (same), cert. denied, 258 Conn. 917, 782 A.2d 1246 (2001); *Day* v. *Middletown*, 59 Conn. App. 816, 821–22, 757 A.2d 1267 (same), cert. denied, 254 Conn. 945, 762 A.2d 900 (2000). We, thus, conclude that the plain language and context of § I-6A-2 do not support the plaintiff's interpretation of the regulations.[6]

---

[6] Relying on *Buttermilk Farms, LLC* v. *Planning & Zoning Commission*, supra, 292 Conn. 317; *Pansy Road, LLC* v. *Town Plan & Zoning Commission*, 283 Conn. 369, 926 A.2d 1029 (2007); and *Trantolo* v. *Town Plan & Zoning*

Alternatively, the plaintiff contends that the regulations are ambiguous. Even if we were to conclude that the regulations are ambiguous, "a court that is faced with two equally plausible interpretations of regulatory language . . . properly may give deference to the construction of that language adopted by the [commission] charged with enforcement of the regulation. . . . Thus, in construing regulations, our function is to determine the expressed legislative intent. . . . Moreover . . . the words employed therein are to be given their commonly approved meaning." (Internal quotation marks omitted.) *Trumbull Falls, LLC* v. *Planning & Zoning Commission*, supra, 97 Conn. App. 23.

We first consider the commission's construction of the regulations. At the public hearing before the commission, there was some discussion concerning the reserve strip and whether a new street may be added onto an already existing dead-end street. The chairman of the commission indicated that an addition to a 1200 foot road was prohibited unless that addition resulted in the formation of a through street, as opposed to a dead-end street. By connecting Eastwood Drive to another street to create a through street, the chairman added, would declassify Eastwood Drive as a permanent dead-end street. Further, the chairman stated that the possibility that Eastwood Drive may be extended or connected to another street does not prevent its classification as a dead-end.[7] Based on the foregoing,

*Commission*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV-960564967 (August 26, 1998), the plaintiff claims that by adding the length of Eastwood Drive to that of Hazel Lane when evaluating his application, the commission improperly considered off-site conditions and the roadway "system." Because there is substantial evidence in the record that the commission viewed Hazel Lane as an addition to Eastwood Drive; see footnote 7 of this opinion; we deem the plaintiff's claim unavailing.

[7] The relevant discussion at the public hearing was as follows:

"UNIDENTIFIED MALE VOICE: My next question is, at the end of the cul-de-sac there is a right-of-way or a proposed road. Why is it there, where does it go and (inaudible)?

as well as the fact that the commission added the length of Eastwood Drive to that of Hazel Lane, the commission construed the regulations as applying to both already existing and newly proposed dead-end streets.

We also may consider the legislative intent of the regulations. During the public hearing, the commission elucidated some concern for emergency vehicle access

"THE CHAIRMAN: That's just, at some point say the town gets enough, in say fifty years down the road or something like that, somebody sells his land and somebody buys and wants to continue this road into Homewood or the town suggests continuing into Homewood, we have a space to connect here where you don't have to go through someone's land. It's just something for the future. It may never be used. There are a couple of places in town like that.

\* \* \*

"What I'm saying is, you can only have a dead end so long.

"UNIDENTIFIED FEMALE VOICE: But you told him that at some future point the town can expand that road.

"THE CHAIRMAN: Right. Then it wouldn't be a dead end but, if the town, say in fifty or a hundred years, the town decides they want to connect, let's say Eastwood and Homewood, and they're able to buy that strip of land, then it's not a dead end anymore because you've got, you—

"UNIDENTIFIED FEMALE VOICE: Right, and you're talking 1200 feet and you can't put or add onto a 1200 foot road because it's a dead end.

"THE CHAIRMAN: If it's not a dead end, you can add onto it.

"UNIDENTIFIED FEMALE VOICE: So, you're saying that this is a temporary dead end (inaudible) until somebody (inaudible)?

"THE CHAIRMAN: If, if that ends up being someone connected it to another through street, yes.

"UNIDENTIFIED FEMALE VOICE: So, you would allow the 1200 foot road that's considered a dead end to be added onto at some point? Then that's never a dead end.

"THE CHAIRMAN: Well—

"UNIDENTIFIED MALE VOICE: No, no, no, no. . . .

"UNIDENTIFIED MALE VOICE: I think, I think the point is, it would only be useful if you connect it with some other street that doesn't exist right now but may exist at some time in the future, I guess.

"UNIDENTIFIED FEMALE VOICE: So, you're saying that's just, any dead-end street might not have the option of being (inaudible)?

"UNIDENTIFIED MALE VOICE: But still needed to be—

"THE CHAIRMAN: If it's to, if it's to another road, yes. . . .

"UNIDENTIFIED MALE VOICE: (Inaudible) Then it would become a through street, which is a different category from a dead end. . . .

"THE CHAIRMAN: Right."

to lots connected to dead-end streets in case of an emergency.[8] Presumably, the commission enacted the 1200 foot regulatory limitation, at least in part, to address this safety concern.[9] Construing the regulation as applying only to new streets not only renders meaningless § I-6A-2 but also contradicts legislative intent.

Finally, it must be remembered that "[w]hen two constructions are possible, courts will adopt the one which makes the [regulation] effective and workable, and not one that leads to difficult and possibly bizarre results." (Internal quotation marks omitted.) *Red Hill Coalition, Inc.* v. *Town Plan & Zoning Commission*, 212 Conn. 727, 737–38, 563 A.2d 1347 (1989); see also *Day* v. *Middletown*, supra, 59 Conn. App. 832 ("[t]he unreasonableness of the result obtained by the acceptance of one possible alternative interpretation of [a regulation] is a reason for rejecting that interpretation in favor of another which would provide a result that is reasonable" [internal quotation marks omitted]). As already noted, interpreting the regulations in the manner advanced by the plaintiff would permit an applicant to continue to extend a dead-end street by adding sections measuring less than 1200 feet that combine to form a single dead-end street in excess of the length limitation. In order to avoid such problematic results,

[8] At the public hearing, the following colloquy concerning safety transpired:

"THE CHAIRMAN: The same thing with the (inaudible), you have something happen at the end of the street, also you can't, you don't have access to any of those lots in the back.

"UNIDENTIFIED MALE VOICE: That's right. You get an accident in the one.

"UNIDENTIFIED MALE VOICE: Egress, ingress.

"UNIDENTIFIED MALE VOICE: Correct."

[9] The plaintiff also claims that the court improperly based its decision on its own public safety concern without finding that the commission had such a concern. We agree with the commission that although the court did address public safety concerns, the true basis of the court's decision rested on the plain language of the regulations.

we conclude that the regulations must apply to both already existing and newly proposed dead-end streets. Accordingly, the defendant's claim fails.

## II

The plaintiff next claims that the court improperly determined that Eastwood Drive is a dead-end street. Specifically, he contends that Eastwood Drive is a loop road that does not fit within the definition of dead-end street as provided in the regulations. We disagree.

The following facts are relevant to our discussion. The court held that "[c]ontrary to the plaintiff's argument, the [c]ommission correctly determined that Eastwood Drive is a dead-end street because it meets the definition of a dead-end street in § I-1J: it provides access to current lots and has only one means of ingress and egress at the intersection with Route 20. . . . The proposed Hazel Lane will also be a dead-end street because it also will have only one means of ingress and egress at its intersection with Eastwood Drive. When its length is added to Eastwood Drive it will create a combined road with only one means of [ingress] and egress at Route 20."

On appeal, the plaintiff contends, and the dissent agrees, that Eastwood Drive is not a dead-end street pursuant to the regulations. The significance of that contention is that if Eastwood Drive is not classified as a dead-end street, then its length cannot be added to that of Hazel Lane when evaluating the plaintiff's application. In support of his claim, the plaintiff relies on § I-6A-2 of the regulations. Specifically, he posits that Eastwood Drive is not a permanent dead-end street because it exceeds 1200 feet in length and, as a loop road, is without a turn-around roadway with a minimum radius of forty-five feet for the outside curb at the closed end—attributes he deems necessary for a street to constitute a dead-end. By determining that Eastwood Drive

is a dead-end street, the plaintiff argues, and the dissent agrees, that the court improperly adopted an expansive interpretation of the regulations in which a loop road is encompassed in the regulation's definition of a dead-end street. We, therefore, must determine what is meant by dead-end street as that term appears in the regulations, and, secondarily, whether Eastwood Drive so comports.

At the outset, we set forth our standard of review. "It is axiomatic that a planning commission, in passing on a [subdivision] application, acts in an administrative capacity and is limited to determining whether the plan complies with the applicable regulations. . . . The commission is entrusted with the function of interpreting and applying its [subdivision] regulations. . . . The trial court must determine whether the commission has correctly interpreted its regulations and applied them with reasonable discretion to the facts. . . . The plaintiffs have the burden of showing that the commission acted improperly. . . . The trial court can sustain the [plaintiff's] appeal only upon a determination that the decision of the commission was unreasonable, arbitrary or illegal . . . . It must not substitute its judgment for that of the . . . commission and must not disturb decisions of local commissions as long as honest judgment has been reasonably and fairly exercised. . . . [A]ppellate review excludes the retrial of the facts. . . . The Appellate Court does not determine whether the trier of facts could have reached a conclusion other than the one reached. It looks both at the conclusion reached and the method by which it was reached to determine whether that conclusion is correct and factually supported." (Internal quotation marks omitted.) *200 Associates, LLC* v. *Planning & Zoning Commission*, 83 Conn. App. 167, 171–72, 851 A.2d 1175, cert. denied, 271 Conn. 906, 859 A.2d 567 (2004).

To the extent that we must interpret the regulations, we are presented with a question of law, and our review is plenary. *Trumbull Falls, LLC* v. *Planning & Zoning Commission,* supra, 97 Conn. App. 21. At the same time, our review of the factual findings of the commission is guided by the substantial evidence standard of review. See *Brunswick* v. *Statewide Grievance Committee,* 103 Conn. App. 601, 612, 931 A.2d 319, cert. denied, 284 Conn. 929, 934 A.2d 244 (2007); *Quality Sand & Gravel, Inc.* v. *Planning & Zoning Commission,* 55 Conn. App. 533, 540, 738 A.2d 1157 (1999).

When examining the regulations, "[w]e . . . are guided by the principle that the [commission] is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires us to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction." (Internal quotation marks omitted.) *State* v. *Fernando A.,* 294 Conn. 1, 21, 981 A.2d 427 (2009). Moreover, we must presume that a reasonable and rational result was intended by the commission in enacting the regulations. See *Spero* v. *Zoning Board of Appeals,* supra, 217 Conn. 441; *Prioli* v. *State Library,* supra, 64 Conn. App. 308; *Day* v. *Middletown,* supra, 59 Conn. App. 822. As General Statutes § 1-2z directs, we first consider the text of the regulation and its relationship to other provisions. See *Red 11, LLC* v. *Conservation Commission,* 117 Conn. App. 630, 641, 980 A.2d 917, cert. denied, 294 Conn. 918, 984 A.2d 67 (2009). Only if the text of the regulation is ambiguous may we consider extratextual evidence. Id.

When a term is defined, we need not consider its common and ordinary meaning.[10] See General Statutes

---

[10] The dissent does not address this tenet of statutory interpretation.

§ 1-1 (a) ("[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly"); *200 Associates, LLC* v. *Planning & Zoning Commission*, supra, 83 Conn. App. 174 ("[i]f it is not otherwise defined, a word has its usual and customary meaning"). In the present case, it is undisputed that the regulations define dead-end street. As such, we need not consider its common and ordinary meaning and, instead, employ the meaning as set forth in the regulations.[11]

We turn, therefore, to the text of the regulations. Section I-1 of the regulations is titled "Definitions." Paragraph J of § I-1 defines "dead-end street." It provides: " 'Dead-end street' shall mean *any* street described in paragraph D of this [s]ection which is used for access to any current lot of record, and which presently provides only one means of ingress or egress." (Emphasis added.) Hartland Subdivision Regs., § I-1J. Paragraph D of § I-1 defines "street" as the following: " 'Street' shall mean and include *any* right-of-way dedicated and accepted for public travel, and *any* right-of-way recorded in the Land Records of the Town of Hartland, which is used or to be used for public access to (a) *any* lot of record or (b) *any* lot sold or set apart in accordance with the Zoning Regulations and amendments thereto." (Emphasis added.) Id., § I-1D. As evidenced by their plain language, §§ I-1J and I-1D broadly define dead-end street and street. Indeed, these

---

[11] In *200 Associates, LLC* v. *Planning & Zoning Commission*, supra, 83 Conn. App. 167, relied on by the plaintiff and cited by the dissent, the applicable regulation provided that a cul-de-sac shall not exceed 1000 feet in length. Id., 170. Because the regulations did not define the term cul-de-sac, the court employed its common and ordinary meaning. Id., 173. In the present case, § I-6A-2 limits the length of dead-end streets to 1200 feet. The term dead-end street is defined in the regulations.

two types of streets are the only ones mentioned in the regulations.

Section I-6 sets forth certain requirements with which private streets included as part of a subdivision application must abide for that subdivision to be approved. Section I-6A-2 requires in relevant part: "Arrangement of streets shall provide for the continuation of the principal streets in adjoining subdivision, or for their proper projection when adjoining property is not subdivided. Permanent dead-end streets shall not exceed 1200 feet in length and shall be equipped with a turn-around roadway with a minimum radius of forty-five (45) feet for the outside curb at the closed end. Such turn-around roadway shall include a right of way with a minimum width of fifty (50) feet, measured from the outside curb at the closed end and continuing to an adjoining property line. . . ."[12]

The plaintiff and the dissent argue that loop roads are not encompassed within the regulations' definition of dead-end street. This conclusion is flawed. "In applying [the principles of statutory construction], we are mindful that the [commission] is presumed to have intended a just and rational result." (Internal quotation marks omitted.) *Blum* v. *Blum*, 109 Conn. App. 316, 322, 951 A.2d 587, cert. denied, 289 Conn. 929, 958 A.2d 157 (2008). Furthermore, "[w]hen construing a [regulation], [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the [commission]." (Internal quotation marks omitted.) *Tayco Corp.* v. *Planning & Zoning Commission*, 294 Conn. 673, 679, 986 A.2d 290 (2010); see also *Nizzardo* v. *State Traffic*

---

[12] The dissent argues that the Eastwood subdivision was approved because the commission viewed Eastwood Drive as a loop road unregulated by the regulations. A more plausible explanation, as recognized by the court, is that the Eastwood subdivision was approved because the commission, at least in 1988, did not view Eastwood Drive as a *permanent* dead-end street. Hence, the existence of the reserve strip.

*Commission*, 259 Conn. 131, 170, 788 A.2d 1158 (2002) (*Borden, J.*, concurring and dissenting) ("[t]he process of statutory interpretation involves a reasoned search for the intention of the [commission]" [internal quotation marks omitted]). In enacting the regulations, the intent of the commission, at least in part, was to limit the length of dead-end streets in subdivisions. This is undisputed. Equally undisputed, and supported by the record before us, is that the commission viewed Hazel Lane and Eastwood Drive as combining to form a single dead-end street measuring well in excess of the 1200 foot regulatory limitation. The interpretation of the regulations championed by both the plaintiff and the dissent would leave unregulated that which § I-6A-2 seeks to regulate, namely, dead-end streets measuring over 1200 feet formed by combining a loop road and a dead-end street. We conclude that that interpretation is irrational and contrary to the intent of the commission. See Hartland Requirements for the Approval of Subdivision Plans, art. I ("the need for *uniform* and *intelligent* subdivision control is apparent" [emphasis added]). We cannot fathom that the commission intended such results.

There is no dispute that Eastwood Drive provides access to current lots. Furthermore, the record indicates that the commission viewed Eastwood Drive as having only one means of ingress or egress.[13] In light

---

[13] At the public hearing before the commission, the following colloquy occurred:

"THE CHAIRMAN: And I know there were some questions, too, on where it starts, and the road starts at the intersection of which one because I know someone at [one] time said where you start it at the cul-de-sac or you start it at the, you know, (inaudible) junction of the road. Eastwood starts and that's that new point, so that's where the 1200 feet would start, and someone else had brought up that they thought [it] was a, I think Scott said a lollipop (inaudible).

"UNIDENTIFIED MALE VOICE: We don't have—

"THE CHAIRMAN: But there's no, nothing in the Hartland road regulations that says anything about a (inaudible) or a lollipop road. All it says is, is a (inaudible) and dead-end street; [those are] the only two streets we've got.

of that evidence, as well as the commission's stated intent and the expansive language of §§ I-1J and I-1D, we conclude that a loop road, such as Eastwood Drive, fits within the regulation's definition of dead-end street. Accordingly, the defendant's claim fails.

## III

The plaintiff finally asserts that the court improperly rejected his claim that the commission arbitrarily reinterpreted the regulations when considering his application. We disagree.

We note that the plaintiff argued before the court that the commission's 1988 approval of the Eastwood subdivision represented conclusive proof that Eastwood Drive is not a dead-end street and that it was binding precedent on future subdivision applications. The court held that, limited to the record before it, "there [was] no way to know what the [c]ommission thought in 1988. Furthermore, even if it were possible to conclude that in 1988 the [c]ommission determined that Eastwood Drive was not a dead-end street, the [c]ommission would be entitled to correct an error, particularly one involving the health and safety of future residents of the subdivision."

"It is well established that an appellate court will not retry the facts. Our review is to determine whether the judgment of the trial court was clearly erroneous or contrary to the law. . . . When . . . the trial court draws conclusions of law, [the scope of our appellate] review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Pinchbeck* v. *Planning &*

"UNIDENTIFIED MALE VOICE: (Inaudible) provides only one means of ingress or egress.
"UNIDENTIFIED MALE VOICE: Right.
"UNIDENTIFIED MALE VOICE: And that's [what] we have here."

*Zoning Commission,* 69 Conn. App. 796, 801, 796 A.2d 1208, cert. denied, 261 Conn. 928, 806 A.2d 1065 (2002).

Although the plaintiff correctly asserts that when a commission previously has interpreted a regulation, the commission's construction is entitled to consideration; see *Fedorich* v. *Zoning Board of Appeals,* 178 Conn. 610, 616–18, 424 A.2d 289 (1979); the record in the present case is without a single indicia to ascertain the commission's reasoning for approving the Eastwood subdivision. Contrary to the plaintiff's assertion, the commission's approval of the Eastwood subdivision in 1988, we conclude, is not proof that Eastwood Drive is not a dead-end street. Because we do not know why the commission approved the Eastwood subdivision in 1988, the plaintiff's claim that the commission allegedly has departed from such an interpretation of the regulations must fail.[14]

The judgment is affirmed.

In this opinion BEACH, J., concurred.

BORDEN, J., dissenting. The majority's opinion rests on the proposition that Eastwood Drive is a dead-end street within the meaning of the applicable subdivision regulations of the town of Hartland. Because I disagree with the majority's interpretation of those regulations, I dissent. I conclude that Eastwood Drive does not constitute a dead-end street under the facts of this case.

I begin with a brief restatement of certain undisputed facts. Eastwood Drive is an existing street in an existing subdivision, namely, the Eastwood subdivision, which was approved in 1988 by the defendant planning and

---

[14] In his appellate brief, the plaintiff claims that his decision to purchase the property was based, in part, on the reserve strip, which he alleges memorialized the commission's consent to a future extension. The record, however, contains no evidence to support that position.

zoning commission of the town of Hartland. Eastwood Drive has a particular and peculiar shape, which can be aptly described as looking something like a partially flattened lollipop.[1] That is, it has a stem of 850 feet, which begins at Route 20. The stem leads into a loop that is 2650 feet in length on which there are fourteen existing lots and houses, ten on the outside perimeter and four on the inside perimeter. In sum, Eastwood Drive is approximately two-thirds of a mile long in total, of which the stem constitutes approximately one-sixth of a mile and the loop constitutes approximately one-half of a mile. When one comes to the top end of the stem, one can drive either right or left on the loop to access any of the fourteen lots on it.

Eastwood Drive would, under the new subdivision application filed by the plaintiff, Harry Kraiza, Jr., connect to a new street, namely, Hazel Lane, which would be 1100 feet in length and which is conceded to be a dead-end street because it ends in a cul-de-sac. Under the applicable subdivision regulations, however, only dead-end streets that are more than 1200 feet in length are proscribed. Thus, because Hazel Lane would be less than 1200 feet in length, the plaintiff's application would have to have been approved—unless the length of Eastwood Drive, *as a dead-end street*, were added to the length of Hazel Lane. That addition is what the defendant did, making, in the defendant's view, the total of the two connected streets—Eastwood Drive and Hazel Lane—one long, dead-end street proscribed by the regulations. In doing so, the defendant rejected the opinion of the planning consultant that it had hired, Martin J. Connor, who opined that Eastwood Drive was not a dead-end street the length of which should be combined

---

[1] The appendix to this dissenting opinion is a rendering of Eastwood Drive taken from the record of the case.

with that of Hazel Lane in assessing whether the plaintiff's proposed subdivision complied with the regulations.[2]

The critical question, therefore, is whether Eastwood Drive—an existing, prior approved street in the existing Eastwood subdivision—is itself a dead-end street. The majority concludes that it is. I conclude otherwise.

I first address the majority's use of the scope of review. In part I of the majority opinion, the majority correctly determines that the question of whether Eastwood Drive is a dead-end street is a question of statutory interpretation, that it is not a question that had been subject to prior judicial scrutiny or to which the administrative agency had applied a time tested interpretation and, therefore, that the court's scope of review was plenary. I fully agree with those conclusions.

I turn, therefore, to the question before us in this appeal: is Eastwood Drive a dead-end street within the meaning of the subdivision regulations? The majority, focusing on only part of the applicable language of the subdivision regulations, namely, the language defining a dead-end street as "any street . . . which presently provides only one means of ingress or egress"; Hartland Subdivision Regs., § I-1J; concludes that Eastwood Drive is a dead-end street because it provides only one means of ingress and egress from Route 20. This conclusion is flawed. In my view, the language of the applicable regulations simply does not contemplate a street of the particular and peculiar configuration of Eastwood Drive.

I begin with the language of the regulations. Section I-1J provides as follows: " 'Dead-end Street' shall mean

---

[2] Specifically, Connor opined: "Eastwood [Drive] would not be described as a permanent dead-end street according to the [town of Hartland] Regulations. . . . It would be better described as a 'loop' or 'lollipop' road. A permanent dead-end road is usually described as a cul-de-sac."

any street described in paragraph D of this Section[3] which is used for access to any current lot of record, and which presently provides only one means of ingress or egress." Section I-6A-2 provides: "Arrangement of streets shall provide for the continuation of the principal streets in adjoining subdivision, or for their proper projection when adjoining property is not subdivided. Permanent dead-end streets shall not exceed 1200 feet in length and shall be equipped with a turn-around roadway with a minimum radius of forty-five (45) feet for the outside curb at the closed end. Such turn-around roadway shall include a right of way with a minimum width of fifty (50) feet, measured from the outside curb at the closed end and continuing to an adjoining property line." These two provisions must be read together. See *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 310, 819 A.2d 260 (2003) (statutes that relate to same subject matter are to be read together).

It may be true, as the majority posits, that § I-1J, read literally and in isolation from § I-6A-2, might include Eastwood Drive, because, using Route 20 as the starting point, there is only one means of ingress and egress to it, namely, the 850 foot long stem. Reading the two provisions together, and in light of common sense; see *Tayco Corp.* v. *Planning & Zoning Commission*, 294 Conn. 673, 686, 986 A.2d 290 (2010); and the normal usages of the English language, however, leads to a different conclusion.

The references in § 1-6A-2 to "a turn-around roadway with a minimum radius of forty-five (45) feet," which "shall include a right of way with a minimum width of

---

[3] Paragraph D defines "Street" as "any right-of-way dedicated and accepted for public travel, and any right-of-way recorded in the Land Records of the Town of Hartland, which is used or to be used for public access to (a) any lot of record or (b) any lot sold or set apart in accordance with the Zoning Regulations and amendments thereto." There is no dispute that Eastwood Drive is a "street."

fifty (50) feet, measured from the outside curb at the closed end," indicate that the definition of "dead-end street" contemplates something much more limited than any street that has only one means of ingress or egress, no matter how peculiar and particular its configuration. Those references indicate that a dead-end street would have a "turn-around roadway" and a "closed end." The language "turn-around roadway" strongly suggests that a dead-end street is one in which drivers would have to turn around in order to get out; hence, the minimum radius requirement for the turn-around. The language "closed end" also strongly suggests the same thing, namely, that a dead-end street is one that has an end that is closed to getting out; hence, the requirement that there be a right-of-way with a minimum width at the closed end.

It is impossible to regard the two way, half-mile long loop of Eastwood Drive as either a turn-around roadway or a closed end. It is not a turn-around roadway because no driver, having come to the end of the stem, has to turn around in order to get out; all she has to do is to continue on around the loop in either direction. Similarly, it does not have a closed end because the end is not closed to getting out; all the driver has to do to get out is to keep driving around the loop in either direction. Common sense and the normal usages of our English language indicate that, when the drafters of the regulations drafted both §§ I-1J and I-6A-2, they had in mind the commonly understood meaning of a dead-end street, namely, a street that requires a driver to turn around at its closed end in order to get out. In other words, they had in mind what most people regard as a dead-end street, namely, a street ending in something like a cul-de-sac. See, e.g., Webster's Third New International Dictionary (1961), giving one definition of "dead end" as "cul-de-sac." See also *200 Associates, LLC* v. *Planning & Zoning Commission*, 83 Conn. App. 167,

173–74, 851 A.2d 1175 (ordinary meaning of cul-de-sac "is a blind alley or a street open at one end only, or a street closed at one end, usually with a turnaround at the closed end, which does not describe . . . a loop road that allows traffic to flow in two directions"), cert. denied, 271 Conn. 906, 859 A.2d 567 (2004).

This is precisely why Connor, the defendant's planning consultant, advised the defendant that Eastwood Drive is not a dead-end street. See footnote 2 of this opinion. It is also the most likely explanation of why the defendant, in 1988, when it approved the Eastwood subdivision, thereby approved Eastwood Drive: because it was not then, and is not now, a dead-end street within the meaning of those regulations. It is something else, namely, what can most aptly be described as a loop street or, perhaps, a lollipop street.

This leads me to one final comment. The dialogue among the members of the defendant indicates that they put some emphasis on the fact that the regulations do not include any provisions for loop or lollipop streets, and, therefore, Eastwood Drive must be a dead-end street because it has only one means of ingress or egress from Route 20. Simply because the regulations of the town do not include a description of such streets does not mean that they do not exist in the town; and simply because the regulations lack such a description does not mean that a street that does not otherwise come within the meaning of the regulations must therefore be stuffed into a definition that does exist. As our Supreme Court has stated: "[C]alling a bull a cow will [not] change its gender." *State* v. *Gooch*, 186 Conn. 17, 18, 438 A.2d 867 (1982). Similarly, calling a loop or lollipop street a dead-end street does not make it so.

I, therefore, dissent and would reverse the trial court's judgment and remand the case with direction to sustain the plaintiff's appeal.

## APPENDIX